J. RICHARD SULLIVAN, Plaintiff v. MEBANE PACKAGING GROUP, INC., JOSEPH G. ANDERSEN, DUSTIN McDULIN and DONNA I. WILSON, Defendants

No. COA02-762

(Filed 20 May 2003)

### 1. Fraud— company buy-back of stock—purchase price

The trial court correctly granted summary judgment for defendants on plaintiff's claims for fraud arising from his former employer's purchase of his company stock where company policy was to limit stock ownership to employees, plaintiff attempted to negotiate a higher price for the stock than that offered by the company, an arrangement was worked out whereby an officer of the company bought the stock for more than the company was willing to pay, and the company was subsequently sold at a share price significantly higher than plaintiff was paid. Plaintiff did not exercise reasonable diligence, did not produce evidence that the company's board was contemplating the company's sale before plaintiff agreed to sell his stock, did not produce evidence that the price he was offered was not reasonable as of the valuation date, and much of the evidence to which plaintiff pointed was immaterial to his decision to sell.

### 2. Fiduciary Relationship— benefit to superior party—presumption of fraud—rebutted by outside advice

The presumption of fraud from a benefit to the superior party in a fiduciary relationship was rebutted by evidence that plaintiff

---

obtained independent advice before selling company stock to his former employer.

### 3. Fraud— negligent misrepresentation—company buy-back of stock—reliance not reasonable

Plaintiff's reliance on any misrepresentations or conceal-ments in a company buy-back of stock was not reasonable and the trial court correctly granted summary judgment for defend-ants on plaintiff's negligent misrepresentation claim. Moreover, plaintiff cannot establish that he relied on representations or decisions made after he decided to sell, and plaintiff presented no evidence that the information provided by the company was prepared without reasonable care.

### 4. Securities— buy-back of company stock—material facts— misstatements or omissions—not shown

Summary judgment was correctly granted for defendants on a claim for violation of the North Carolina Securities Act, N.C.G.S. § 78-56(b), arising from the purchase of company stock from a former employee where plaintiff did not estab-lish that defendants actively misstated any material facts and plaintiff did not establish the presence of an omission of which he was unaware.

### 5. Damages and Remedies— punitive—judgment for defend-ant on compensatory claims

Defendants were entitled to summary judgment on plaintiff's punitive damages claims where they were entitled to judgment in their favor as a matter of law on the underlying claims.

Appeal by plaintiff from orders entered 22 February 2002 by Judge Orlando F. Hudson, Jr., in Alamance County Superior Court. Heard in the Court of Appeals 25 March 2003.

*Vernon, Vernon, Wooten, Brown, Andrews & Garrett, P.A., by John H. Vernon, III, Mark A. Jones, and Benjamin D. Overby, for plaintiff-appellant.*

*G. Wayne Abernathy, and Alston & Bird LLP, by Mary C. Gill, for defendant-appellees Mebane Packaging Group, Inc. and Joseph G. Andersen.*

SULLIVAN v. MEBANE PACKAGING GRP., INC.

[158 N.C. App. 19 (2003)]

MARTIN, Judge.

Plaintiff J. Richard Sullivan appeals the entry of summary judgment in favor of defendants Mebane Packaging Group, Inc. ("MPG"), and Joseph G. Andersen. Plaintiff, a former MPG employee, filed his complaint in this action on 12 October 2000 alleging claims of fraud, constructive fraud, negligent misrepresentation, and a violation of the North Carolina Securities Act arising out of his sale of MPG stock to defendant Joseph G. Andersen. Plaintiff voluntarily dismissed defendants Dustin McDulin and Donna I. Wilson from the suit on 10 January 2002.

The materials before the trial court at the summary judgment hearing established that plaintiff worked for MPG from 1978 until mid-February 1999. In 1994, plaintiff acquired 2,000 shares of company stock from MPG. When plaintiff left MPG in February 1999, his stock was governed by an Amended and Restated Shareholders' Agreement (the "Agreement"). Under that Agreement, within 90 days of his termination, plaintiff had a so-called "put right" to require MPG to buy back his shares. In the event plaintiff did not exercise his put right during those 90 days, MPG would have a "call right" to require that plaintiff sell his shares back to the company. If either the put right or call right were exercised, the shares would be sold for a price equal to the greater of fair value or book value as of the end of the fiscal month immediately preceding plaintiff's termination date. Fair value was defined by the Agreement as the price agreed upon by the parties, or in the absence of agreement, as determined by an independent investment banking firm. MPG could also elect not to exercise its call right, in which event plaintiff would not be required to sell the stock.

Plaintiff testified he knew MPG could require that he sell back his 2,000 shares of MPG stock upon his leaving the company. Plaintiff testified that in mid-February, he met with McDulin and Wilson about leaving MPG. During that meeting, plaintiff asked what MPG was going to do about his shares, because he was aware it was MPG's policy that only employees were to own stock in the company. Sometime thereafter, McDulin explained to plaintiff that he would need to sell his shares back to MPG, and that the value of the stock as of the end of January 1999 was $17 per share based upon an MPG formula set forth in the company's monthly financial package. Shortly thereafter, Wilson delivered to plaintiff a promissory note dated 18 February 1999 stating that plaintiff would sell his shares to MPG for $17 a share, and containing a place for plaintiff's signature. Wilson

testified she instructed plaintiff to consult with his attorney about the promissory note. Defendant Andersen, MPG's Chief Financial Officer, instructed Wilson to present the promissory note to plaintiff because it was MPG policy that only employees were entitled to be stock-holders. Andersen testified that MPG's Board of Directors set the price of the shares at $17 each based upon a stock valuation model and the value of MPG stock as of the closest month-end to plaintiff's termination date.

Plaintiff testified that he did consult with his attorney about the promissory note and sale of his stock and concluded that while he "didn't have any objection to selling the stock," he did not want to sell for $17 per share. Plaintiff testified he had no basis for seeking to sell the stock at more than $17 per share, other than his opinion that he "just thought it was worth more than that." Plaintiff did not act on the promissory note, and was subsequently contacted independently by Wilson and McDulin, who each informed plaintiff that he needed to sell his stock to MPG and that $17 was the value per share of the stock. Plaintiff told McDulin that he would sell his stock to MPG for $26 per share. Plaintiff testified that throughout this negotiation process, he requested a copy of the Agreement more than once from McDulin, yet never received such a copy. Andersen testified he was never told that plaintiff wished to have a copy of the Agreement.

Andersen further testified that he met with plaintiff between 4 May and 24 May 1999 to assist him in understanding how MPG had valued his stock at $17 per share, including the fact that it was based on the value of MPG shares as of January 1999, the month ending just prior to plaintiff's termination, as required by the Agreement. Andersen provided plaintiff with MPG's March financial package, which was completed 4 May 1999, and was the most recent financial package available. The package showed the value of plaintiff's stock to be $17 per share as of the end of January 1999, as well as an increase in the value of the stock in the following months. Andersen told plaintiff to take the materials home to review, to consult with his attorney about the information, and to call Andersen if he had any questions. Plaintiff testified that he took the information home, and after showing it to his business partner, simply put it away and never looked at it again because he "wouldn't have understood it." Plaintiff did not consult with his attorney or an accountant about the materials, and never called Andersen with any questions.

Following the meeting with Andersen, plaintiff spoke to McDulin and suggested splitting the difference between $17 and the $26 price,

which plaintiff had demanded earlier. Plaintiff told McDulin he would sell his stock to MPG for $22 a share. McDulin communicated plaintiff's offer to MPG. Andersen testified the discussions within MPG over plaintiff's offer took place in May 1999. Andersen testified that MPG decided it was not willing to pay $22 per share since MPG valued the stock at $17 per share. Instead, MPG offered Andersen the right to purchase plaintiff's stock for $22 a share. Andersen was informed he was under no obligation to purchase plaintiff's shares and that if he did not desire to do so, MPG would require plaintiff to sell his stock to the company at $17 per share. George Krall, MPG's President and Chief Executive Officer, testified that he approved allowing Andersen to purchase plaintiff's shares because it would allow plaintiff to receive the price he desired for the shares while rewarding Andersen for his work at MPG. Garrison Kitchen, a member of MPG's Board of Directors, likewise testified it was his understanding that both Andersen and plaintiff desired such an agreement because it was mutually beneficial and would allow plaintiff to receive a higher price for his stock. Andersen agreed to purchase plaintiff's shares for $22 a share, and plaintiff was informed that his offer had been accepted.

As a result, on 1 June 1999, MPG's Board of Directors executed a consent action finding that plaintiff desired to sell his stock shares, that Andersen desired to buy plaintiff's shares of stock, and that it was in MPG's best interest to allow Andersen to purchase plaintiff's 2,000 shares. The Board accordingly waived its call right in favor of Andersen. Immediately thereafter, Andersen applied for a bank loan for the purchase price. On 15 June 1999, Andersen obtained a bank line of credit in the amount of $44,000, the total purchase price for 2,000 shares at $22 per share.

On 8 August 1999, plaintiff met with McDulin to sign over his stock. Plaintiff testified that when he arrived for the closing, he was informed that Andersen had agreed to purchase the stock. Plaintiff testified that he had assumed MPG's majority shareholder, Cravey, Green and Whalen, Inc. ("CGW"), would be purchasing the stock. Plaintiff did not object to selling the stock to Andersen, and he testified it made no difference to him who was purchasing his stock, so long as he would receive $22 a share.

On 24 November 1999, MPG was sold to Westvaco Corporation through execution of a stock purchase agreement. Plaintiff's former 2,000 shares were sold to Westvaco at a price significantly higher than the $44,000 plaintiff received for his sale to Andersen. Plaintiff testi-

fied that he first heard rumors about a sale of MPG in July, but that he never asked Wilson, Andersen or McDulin about the rumors, and that, in any event, a sale of the company did not matter to him.

Richard Cravey, an MPG director, testified that prior to the fall of 1999, MPG received several unsolicited inquiries with respect to the availability of the company for sale. Cravey testified the inquiries were simply statements of interest that if MPG were for sale, the interested party might be willing to buy the company. Cravey testified these interested parties were informed MPG was not for sale. As a result, MPG never received an actual offer to buy. Cravey reiterated that between January 1999 and the August 1999 closing on plaintiff's stock, there were no discussions with prospective purchasers.

Cravey further testified that although Donaldson, Lufkin & Jenrette ("DLJ"), an investment banking firm that had previously worked with MPG, was sending MPG financial packages and information that could be used to market the company, such information had not been requested by MPG, but was voluntarily submitted by DLJ as a means to promote the sale of MPG which would generate a fee for DLJ. Despite receiving this information from DLJ, Cravey testified that MPG directors "continued to resist . . . because we didn't think it was the right time to sell the business," and that each time MPG received packages from DLJ, there were discussions about how MPG was not ready to be sold. Cravey testified the possibility of selling MPG was not even a consideration until the third week of August 1999, when discussions took place which were prompted by MPG's increased level of profitability which might justify a sale.

Cravey's testimony was corroborated by other MPG employees, including Andersen, who confirmed that no discussions concerning a possible sale of MPG occurred between MPG and CGW until the fall of 1999, after plaintiff's sale of his stock. McDulin likewise testified that a potential sale of MPG was first discussed in late August or early September, but only to the extent of discussing whether it would be the right time to sell MPG; there were no specific offers of sale at that time, and there were no such discussions prior to that time. Wilson also testified that she did not hear rumors of an MPG sale until October or November 1999. Krall, MPG's President and CEO, confirmed that discussions of a potential sale of MPG took place in late August. Krall testified MPG directors were not sure at that point whether a sale was in the company's best interest. Kitchen also testified that the first discussions MPG had with DLJ about a possible sale took place after plaintiff's sale of his stock.

SULLIVAN v. MEBANE PACKAGING GRP., INC.

[158 N.C. App. 19 (2003)]

Joe King, an employee of DLJ during the relevant time period, testified it was normal practice for DLJ to send financial and industry information to clients, such as MPG, with which DLJ had done business or sought to do business. King identified a DLJ document establishing that 30 September 1999 was the first date initial calls were made to potential purchasers of MPG.

Defendants and plaintiff moved for summary judgment. The trial court concluded that plaintiff was unable to produce evidence to support each essential element of his claims, that there were no genuine issues of material fact as to the essential elements of plaintiff's claims, and that defendants were entitled to judgment as a matter of law.

---

Plaintiff argues the trial court erred in granting summary judgment for defendants because he produced sufficient evidence to establish genuine issues of material fact as to his claims of (1) fraud; (2) constructive fraud; (3) negligent misrepresentation; (4) a violation of the North Carolina Securities Act; and (5) punitive damages. For reasons set forth below, we affirm summary judgment in favor of defendants with respect to each of plaintiff's claims.

The standard with respect to summary judgment is well-established. Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2002). "The purpose of the rule is to avoid a formal trial where only questions of law remain and where an unmistakable weakness in a party's claim or defense exists." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579, 573 S.E.2d 118, 123 (2002). " 'The party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact.' " *Guthrie v. Conroy*, 152 N.C. App. 15, 20, 567 S.E.2d 403, 408 (2002) (citation omitted). That burden may be satisfied by showing that an essential element of the opposing party's claim is either nonexistent or that evidence is not available to support it. *BNT Co. v. Baker Precythe Dev. Co.*, 151 N.C. App. 52, 564 S.E.2d 891, *disc. review denied*, 356 N.C. 159, 569 S.E.2d 283 (2002). "[T]he nonmovant must 'produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial.' " *Guthrie*, 152 N.C. App. at 21, 567 S.E.2d

at 408 (citation omitted). The evidence must be viewed in the light most favorable to the non-movant. *Id.*

## I. Fraud

[1] "The essential elements of fraud are: '(1) False representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.'" *Rowan County Bd. of Educ. v. United States Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658-59 (1992) (citation omitted). "Additionally, reliance on alleged false representations must be reasonable." *State Props., L.L.C. v. Ray*, 155 N.C. App. 65, 72, 574 S.E.2d 180, 186 (2002), *disc. review denied*, 356 N.C. 694, —— S.E.2d —— (27 February 2003). Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate. *Id.*; *Everts v. Parkinson*, 147 N.C. App. 315, 325, 555 S.E.2d 667, 674 (2001) (" 'The right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him. The policy of the courts is . . . not to encourage negligence and inattention to one's own interest.' " (citation omitted)). "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *State Props., L.L.C.*, 155 N.C. App. at 73, 574 S.E.2d at 186.

Plaintiff bases his fraud claim on allegations that defendants consistently concealed and misrepresented facts material to his decision to sell his stock at $22 a share. Plaintiff maintains defendants fraudulently concealed (1) plaintiff's rights under the Agreement, including his put right and option to have fair value determined by an independent investment banking firm; (2) MPG's waiver of its call right on 1 June 1999; (3) the increase in value of MPG stock from March through July as shown in MPG's monthly financial packages; (4) MPG's financial information prior to the August 1999 closing which showed the company's improvement in performance and growth; (5) MPG's projected financial results for the fiscal year ending March 2000, an explanation of its poor performance for the fiscal year ending March 1999, and any strategic restructuring undertaken by MPG affecting its financial condition; (6) that MPG received communications from parties expressing interest in purchasing the company; and (7) that MPG received information from DLJ about the climate of the industry, potential purchasers, and a suggested sale price for MPG. Plaintiff also argues defendants actively misrepresented (1) that he

was required to sell his shares to MPG; (2) that he was required to sell at $17 per share; and (3) that the value of the shares was between $17 and $22 as shown in the March financial package.

## A. Plaintiff's rights under the Agreement

To the extent plaintiff's claim is based on allegations that defendants both concealed and misrepresented his rights under the Agreement, plaintiff conceded that MPG provided him, as a shareholder, with a copy of a document (which plaintiff produced through discovery) which contained a section describing plaintiff's rights under the Agreement. That document informed plaintiff that upon termination, plaintiff had a put right to require that MPG buy back his stock; that if plaintiff did not require MPG to buy the stock, MPG would have a call right to require that plaintiff sell back his stock; that in all cases, the sale price of the shares would be the greater of fair value and book value; and that fair value would be the price agreed upon by the parties, or in the absence of an agreement, as determined by an independent investment banking firm.

Plaintiff's reliance on any misrepresentations or concealments regarding his rights under the Agreement must have been reasonable. *See State Props.*, *L.L.C.*, 155 N.C. App. at 186, 574 S.E.2d at 186; *Everts*, 147 N.C. App. at 325, 555 S.E.2d at 674. Plaintiff was provided a document summarizing his pertinent rights under the Agreement; through reasonable diligence or minimal investigation, he could have discovered that he had a put right, that he could require that the fair value of the shares be determined by an independent banking firm, and that MPG had the right to force plaintiff to sell back his shares. Plaintiff produced no evidence showing this information was not in his possession or was otherwise unavailable to him; to the contrary, plaintiff conceded MPG had provided him with that information. Although plaintiff argues this document did not inform him that he had 90 days to exercise his put right, that MPG had 180 days to exercise its call right, and that MPG could waive its call right, plaintiff made no showing that these specific facts, even if concealed, were material to his decision to sell the stock. The only evidence of plaintiff's efforts to investigate his rights as a shareholder consisted of his testimony that he requested a copy of the Agreement from McDulin, which he never received. Such a request, absent more, does not constitute reasonable diligence. At the least, plaintiff could have ceased negotiating with MPG until he was provided a copy of the Agreement.

Accordingly, any reliance on alleged misrepresentations or concealments with respect to plaintiff's material rights under the Agreement was not reasonable and cannot form the basis of plaintiff's fraud claim. *See, e.g., Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 341 (4th Cir. 1998) (citations omitted) ("North Carolina courts recognize that . . . if a plaintiff had an alternative source for the information that is alleged to have been concealed from or misrepresented to him, his ignorance or reliance on any misinformation is not reasonable."); *Myers v. Finkle*, 950 F.2d 165, 167 (4th Cir. 1991) ("In our view, knowledge of information should be imputed to investors who fail to exercise caution when they have in their possession documents apprising them of the risks attendant to the investments."). In any event, plaintiff knew MPG policy was that only employees of the company could own stock, and plaintiff testified he had no objection to selling his shares to MPG, but simply wanted a price higher than $17 per share.

## B. Waiver of MPG's call right

Plaintiff also argues defendants fraudulently concealed the fact that MPG waived its call right on 1 June 1999. Plaintiff attempts to create an issue of fact as to the time frame in which he agreed to sell his stock at $22 a share in order to show that he had not yet agreed to sell at the time MPG waived its call right; that as a result, plaintiff would not have been required to sell the stock at all; and thus, MPG's failure to inform plaintiff that it had done so was a concealment of material fact. However, defendants presented evidence to support their position that MPG waived its call right in favor of Andersen only after plaintiff offered to sell his shares for $22 per share. MPG's subsequent waiver of its call right had no bearing on plaintiff's agreement to sell and could not have been material to that transaction.

Defendants presented evidence that plaintiff agreed to sell his stock to MPG for $22 a share in May 1999. Andersen testified that when he met with plaintiff in May 1999 to explain the valuation of the stock, he provided plaintiff with the most recent monthly financial package available at that time, which was the March package. The March package was made available on 4 May, and the subsequent April financial package was not completed until 24 May, showing that Andersen met with plaintiff between 4 May and 24 May. At that time, plaintiff had offered to sell the stock at $26 per share. Following the meeting with Andersen, plaintiff offered to split the difference between $17 and $26 and sell his shares for $22 per share. Andersen

SULLIVAN v. MEBANE PACKAGING GRP., INC.

[158 N.C. App. 19 (2003)]

testified that discussions within MPG about plaintiff's offer took place in May.

The consent action of the Board of Directors entered 1 June 1999 confirms this time frame, as it states that at that time, plaintiff had agreed to sell his stock, and Andersen had agreed to buy plaintiff's stock. Andersen testified that the Board waived its call right in favor of him on 1 June only after MPG determined it would not pay plaintiff $22 per share and Andersen had been presented with and accepted plaintiff's offer. Moreover, it is clear that the agreement was reached prior to the Board's entry of the consent action, for immediately thereafter, Andersen applied for a line of credit for the purchase price of plaintiff's stock. Bank documents confirmed that on 15 June 1999, Andersen obtained the line of credit in the amount of $44,000, the amount owed plaintiff for 2,000 shares at $22 per share.

Further, both parties presented evidence of MPG's policy that only employees of MPG could be stockholders in the company. MPG consistently reiterated this fact to plaintiff and continued to inform him throughout the process that he would be required to sell his stock to MPG; there is no evidence that MPG ever considered allowing plaintiff to retain his stock. This evidence supports a conclusion that MPG would waive its call right only upon an agreement for plaintiff's stock to be sold to a current employee of the company.

Plaintiff testified in his deposition that he "believ[ed]" it was sometime in June or July that he met with Andersen to review the March financial package, but later stated it took place at the end of June "or somewhere around there," and later testified it was "probably towards the middle of June." Plaintiff testified that it was "probably" around the beginning of July "or something like that" when he first suggested selling for $22 per share. When later asked about other events alleged to have occurred in July 1999, plaintiff confessed, "I have all these dates messed up." Indeed, plaintiff's complaint affirmatively alleged that he offered to sell his shares for $44,000 on 4 August 1999, four days before the transaction's closing.

Plaintiff's testimony is not only clearly an estimate as to when the relevant events took place, but is logically inconsistent with the record evidence: the Board's consent action clearly enumerated that plaintiff had agreed to sell and Andersen had agreed to buy by 1 June 1999, and Andersen obtained a line of credit for the exact $44,000 purchase price for $22 per share on 15 June 1999, long before the time at which plaintiff alleges he offered to sell at that price. Defendants pro-

duced evidence to support their position that plaintiff agreed to sell in May 1999; the burden thus shifted to plaintiff to produce concrete evidence supporting his position that he did not agree to sell until the beginning of July, as he testified, or on 4 August 1999, as he alleged in his complaint. *See, e.g., Lexington State Bank v. Miller*, 137 N.C. App. 748, 751, 529 S.E.2d 454, 456 (upon production of evidence establishing no genuine issue of material fact, burden shifts to non-movant to show existence of such genuine issue by a showing of specific facts; mere allegations are insufficient), *disc. review denied*, 352 N.C. 589, 544 S.E.2d 781 (2000). Plaintiff has not carried that burden. Thus, MPG's waiver of its call right in favor of Andersen in June 1999 was immaterial to plaintiff's May 1999 agreement to sell, and cannot form the basis of plaintiff's fraud claim.

## C. MPG financial information

Plaintiff argues defendants fraudulently concealed the increase in the value of MPG stock from March through July, as shown in MPG's monthly financial packages, and that defendants failed to disclose to plaintiff any financial information, including all of the monthly financial packages completed prior to the August closing, which showed MPG's improved financial status. However, as previously discussed, there is no genuine issue of fact that plaintiff reached an agreement with MPG to sell his shares in May 1999. The fact that the value of MPG shares increased thereafter could not have been a factor in plaintiff's decision to sell in May 1999, and thus was not material to that transaction. At the time plaintiff agreed to sell, he had been provided with financial information showing the value of the shares as of the end of January 1999, which, under the Agreement, was the date as of which the value of plaintiff's shares was to be determined.

Moreover, though plaintiff argues defendants misrepresented the value of the stock to be $17 per share and that MPG's March financial package was somehow misleading, plaintiff produced no evidence showing that the $17 per share value was not a reasonable value of the stock as of the end of January 1999. In fact, plaintiff conceded he had no basis, other than his personal opinion, for believing the stock was worth more. In any event, Andersen provided plaintiff with MPG financial information, explained its method of stock valuation, and told plaintiff to consult with an attorney regarding the information and call if he had any questions. Plaintiff neither consulted with an attorney or an accountant about the information, nor did he ever call Andersen with any questions about the information or MPG's valuation of the stock. Plaintiff's offer to sell his shares for $22 per share

SULLIVAN v. MEBANE PACKAGING GRP., INC.

[158 N.C. App. 19 (2003)]

was based solely on his own suggestion that the parties split the difference between MPG's $17 offer and plaintiff's demand of $26. Thus, plaintiff failed to produce evidence that he relied on any information provided by MPG, or that if he did, such reliance was justified, given his possession of a document outlining his right to have the fair value of his shares determined by an independent firm in the event he did not agree with MPG's valuation.

Plaintiff also argues defendants failed to provide him with information on MPG's projected financial results for the fiscal year ending March 2000, an explanation of its poor performance for the fiscal year ending March 1999, and any strategic restructuring undertaken by MPG to improve its financial condition. Even if plaintiff were entitled to this information as of May 1999, plaintiff failed to carry his burden of producing evidence to show that the information would have been material to his decision to sell, or that he would have relied on the information, given the evidence that he did not rely on other financial information provided by MPG in offering to sell at $22 a share.

## D. Potential sale of MPG

Plaintiff's claim that defendants fraudulently concealed the contemplated sale of MPG is based solely upon evidence that prior to the sale of his stock to Andersen, MPG had received communications from parties interested in purchasing MPG, and had received information from DLJ about the climate of the industry, potential purchasers, and a suggested sale price for MPG. Plaintiff maintains this evidence establishes an inference sufficient to create a genuine issue of fact as to whether, during negotiations for his stock, MPG's board was considering a sale of the company which would have greatly affected the value of plaintiff's stock, and this fact was material to his decision to sell for $22 a share. We disagree.

Contrary to his argument, plaintiff produced no evidence that MPG was considering a sale of the company prior to the time he agreed to sell his stock. The evidence that MPG's board did not want to sell the company at that time was not controverted, and showed that information provided to MPG by DLJ was unsolicited, rather than at the request of any employee of MPG, and that DLJ's custom was to provide such a service to former and potential clients such as MPG. Cravey's uncontradicted testimony established that even though the company was receiving such information, MPG's directors continued to conclude that it was not the right time to sell the company. There was no evidence in the record to show that MPG engaged in discus-

sions of a potential sale during any time relevant to plaintiff's sale of his stock. Cravey testified that MPG received inquiries about the company from potential purchasers, but that the inquiries were simply statements of interest, and never involved actual offers to buy because all inquirers were informed that MPG was not for sale. The uncontradicted evidence established that MPG directors did not even begin discussions on the possibility of a sale of the company until late August, after plaintiff had already agreed to sell his stock for $22 per share, and after the sale of the stock had been completed.

In any event, plaintiff specifically testified that at the time of the sale, it did not matter to him whether the company was being sold. This testimony was corroborated by the fact that despite hearing rumors of a sale prior to the closing on his stock, plaintiff never asked Wilson, McDulin, or Andersen about the rumors. Therefore, even if MPG had concealed discussions of a potential sale, plaintiff's own evidence shows that such information, had it been disclosed, would not have been material to him in considering whether to sell at $22 per share.

The trial court did not err in concluding that plaintiff failed to produce evidence to support each essential element of his fraud claim, that there were no genuine issues of material fact as to the essential elements of that claim, and that defendants were entitled to summary judgment in their favor on this issue.

## II. Constructive Fraud

[2] "Constructive fraud arises where a confidential or fiduciary relationship exists, and its proof is less 'exacting' than that required for actual fraud." *Cash v. State Farm Mut. Auto. Ins. Co.*, 137 N.C. App. 192, 206, 528 S.E.2d 372, 380, *affirmed*, 353 N.C. 257, 538 S.E.2d 569 (2000). In order to show constructive fraud, a plaintiff must establish (1) facts and circumstances creating a relation of trust and confidence; (2) which surrounded the consummation of the transaction in which the defendant is alleged to have taken advantage of the relationship; and (3) the defendant sought to benefit himself in the transaction. *Walker v. Sloan*, 137 N.C. App. 387, 401-02, 529 S.E.2d 236, 246 (2000). Where a fiduciary relationship exists between the parties, the presumption of fraud arises where the superior party obtains a possible benefit. *Cash*, 137 N.C. App. at 206, 528 S.E.2d at 380. However, this presumption may be rebutted by evidence that the other party obtained independent advice. *Id.* "Once rebutted, the presumption evaporates, and the accusing party must shoulder the burden of pro-

ducing actual evidence of fraud." *Id.*; *see also Watts v. Cumberland County Hospital Systems, Inc.*, 317 N.C. 321, 324-25, 345 S.E.2d 201, 203 (1986) (plaintiff could not rely on constructive fraud, but was required to show facts supporting claim of actual fraud where evidence demonstrated that plaintiff received outside opinions on transaction at issue).

In this case, MPG's directors and officers were fiduciaries to plaintiff, a shareholder. *See IRA for benefit of Oppenheimer v. Brenner Cos.*, 107 N.C. App. 16, 419 S.E.2d 354, *disc. review denied*, 332 N.C. 666, 424 S.E.2d 401 (1992). Plaintiff argues MPG used this relationship to its benefit to induce him to sell his shares without providing him with pertinent financial information and by misrepresenting his rights and the value of the shares. However, plaintiff's evidence showed that he obtained outside advice throughout the negotiation process, as defendants consistently advised him to do. Plaintiff testified he discussed MPG's initial promissory note with his attorney, after which plaintiff concluded that he would sell his shares, but seek a price higher than $17 per share. Plaintiff testified he met with his attorney again regarding the sale of his shares during the negotiation process, and acknowledged having shown the March financial package to his business partner to obtain his thoughts. Therefore, the evidence rebuts the presumption afforded under the theory of constructive fraud, *see Watts, supra*, and plaintiff must produce evidence of actual fraud. As previously discussed, plaintiff did not present evidence of each essential element of a claim of fraud, and cannot recover on that basis. Summary judgment was properly granted in favor of defendants with respect to plaintiff's claim alleging constructive fraud.

### III. Negligent Misrepresentation

[3] " 'The tort of negligent misrepresentation occurs when [(1)] a party justifiably relies [(2)] to his detriment [(3)] on information prepared without reasonable care [(4)] by one who owed the relying party a duty of care.' " *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532, 537 S.E.2d 237, 240 (2000) (citation omitted), *disc. review denied*, 353 N.C. 381, 547 S.E.2d 18 (2001). Plaintiff argues he presented sufficient evidence of defendants' negligent misrepresentations based on the same actions and omissions alleged in Part I above. For the same reasons discussed in Part I, we hold the trial court did not err in granting summary judgment for defendants on this claim. As with fraud, plaintiff's reliance must have been reasonable in order to recover under a theory of negligent misrepresenta-

tion. We have already held plaintiff's reliance on any misrepresentations or concealments of his rights under the Agreement was not reasonable. Moreover, because the waiver of MPG's call right, the preparation of financial packages after the March 1999 package, and MPG's discussions of a potential sale of the company all occurred after plaintiff agreed to sell his stock, plaintiff cannot establish that he relied on such information in agreeing to sell. Additionally, plaintiff has presented no evidence to show that the information provided by MPG, including the March financial package and $17 valuation of plaintiff's shares, was information prepared without reasonable care. These assignments of error are overruled.

## IV. North Carolina Securities Act

[4] Under G.S. § 78A-56(b), a defendant may be civilly liable where (1) the plaintiff can show the defendant (a) made an untrue statement of a material fact, or (b) omitted "to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the [plaintiff] not knowing of the untruth or omission)," and (2) the defendant cannot show that he did not know, or in the exercise of reasonable care could not have known, of the untruth or omission. N.C. Gen. Stat. § 78A-56(b) (2003). Plaintiff argues, based on his allegations set forth above, that defendants' acts and omissions constituted a violation of this statute. We disagree.

First, plaintiff did not establish that defendants actively misstated any material facts. At the time plaintiff made his decision to sell the stock in May 1999, he had been fully and correctly informed that MPG had the right to require that he sell his stock. Plaintiff testified that he knew, even prior to the commencement of negotiations for his stock, MPG policy was that only employees could own stock. Plaintiff has not produced any evidence that defendant's valuation of the stock at $17 was "untrue" or otherwise unreasonable or misleading. Second, as to defendants' alleged omissions and concealments, the statute requires that they pertain to material facts. As we have previously discussed at length, defendants' alleged concealment of the waiver of MPG's call right, various financial information about the increased value of the stock and financial status of the company, and discussions of a potential sale of MPG could not have been material to plaintiff's decision to sell in May 1999.

Moreover, we cannot agree, in light of the circumstances, that defendants omitted to state material facts regarding plaintiff's rights

under the Agreement within the meaning of the statute. To the contrary, MPG provided plaintiff with a document summarizing his material rights under the Agreement, which clearly set forth the terms material to the transaction: the put right, the call right, and the option of having fair value determined by a third party. Plaintiff has therefore not established the presence of an omission of which he was unaware, particularly in light of his testimony that he knew from the outset that a sale of the shares would have to occur once he left the company.

## V. Punitive Damages

**[5]** Finally, because defendants carried their burden of showing there were no genuine issues of material fact and that they were entitled to judgment in their favor as a matter of law as to plaintiff's underlying claims, summary judgment will also be affirmed as to plaintiff's claim for punitive damages. *See* N.C. Gen. Stat. § 1D-15(a) (2003) (plaintiff only entitled to punitive damages where plaintiff proves defendant is liable for compensatory damages).

Affirmed.

Judges HUDSON and ELMORE concur.