L'Heureux Enters., Inc. v. Port City Java, Inc., 2009 NCBC 24.

STATE OF NORTH CAROLINA　　　　　IN THE GENERAL COURT OF JUSTICE
　　　　　　　　　　　　　　　　　　　　　　SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER　　　　　　　　　　06 CVS 3367


L'HEUREUX ENTERPRISES, INC.; DAVID　)
ALAN L'HEUREUX and PETER ARNOLD　　)
L'HEUREUX,　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiffs　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　v.　　　　　　　　　　　　　　)　　　**ORDER AND OPINION**
　　　　　　　　　　　　　　　　　　　　　)
PORT CITY JAVA, INC.; PCJ　　　　　　)
FRANCHISING COMPANY, LLC;　　　　　)
PCJ VENTURES, LLC; DONALD　　　　　)
F. REYNOLDS, JR., Individually　　　　　)
and WILD FLOUR BREAD COMPANY, LLC, )
　　　　　　　　　　　Defendants　　　　)


　　　　　THIS CAUSE, designated a complex business case by Order of the Chief Justice

of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b), and

assigned to the undersigned Special Superior Court Judge for Complex Business

Cases, by order of the Chief Special Superior Court Judge for Complex Business

Cases, is before the court upon (a) the Plaintiffs' Motion for Summary Judgment

("Plaintiffs' Motion") and Defendants' Motion for Summary Judgment ("Defendants'

Motion") (collectively, the "Motions"), pursuant to the provisions of Rule 56, North

Carolina Rules of Civil Procedure ("Rule(s)"); and (b) Plaintiff's Motion to Strike and

Motion for Sanctions ("Motion to Strike"),[1] pursuant to Rule 12(f).

　　　　　After considering the arguments, briefs, other submissions of counsel and

appropriate matters of record, as discussed *infra*, the court concludes that the Plaintiffs'

---

[1] Plaintiffs withdrew their Motion for Sanctions on March 3, 2009.

Motion should be DENIED, Defendants' Motion should be GRANTED and the Motion to Strike should be DENIED.

> *The Law Office of Jacqueline M. Druar, PLLC by Jacqueline M. Druar, Esq. and The Law Office of Robert M. Axelrod, PLLC by Robert M. Axelrod, Esq. for Plaintiffs L'Heureux Enterprises, Inc.; David Alan L'Heureux and Peter Arnold L'Heureux.*

> *Wells Jenkins Lucas & Jenkins, PLLC by Ellis B. Drew, III, Esq. and John L. Barber, Esq. for Defendants Port City Java, Inc.; PCJ Franchising Company, LLC; PCJ Ventures, LLC; Donald F. Reynolds, Jr., Individually and Wild Flour Bread Company, LLC.*

Jolly, Judge.

I.

## THE PARTIES

[1]     Plaintiff L'Heureux Enterprises, Inc. ("L'Heureux Enterprises") is a corporation formed under the laws of the State of North Carolina with a principal place of business in the State of Connecticut.

[2]     Plaintiff David L'Heureux is a resident of the State of Connecticut.

[3]     Plaintiff Peter L'Heureux is a resident of the State of Connecticut.  He is grandfather of David L'Heureux.

[4]     Defendant Port City Java, Inc. ("PCJ") is a corporation formed under the laws of the State of North Carolina, with a principal office in Wilmington, New Hanover County, North Carolina.

[5]     Defendant PCJ Franchising Company, LLC ("PCJ Franchising") is a limited liability company formed under the laws of the State of North Carolina, with a principal office in Wilmington, New Hanover County, North Carolina.

[6]     Defendant PCJ Ventures, LLC ("PCJ Ventures") is a limited liability company formed under the laws of the State of North Carolina, with a principal office in

Wilmington, New Hanover County, North Carolina. It is alleged to be the parent entity of PCJ Franchising.

[7]     Defendant Donald Reynolds, Jr. ("Reynolds") is a resident of New Hanover County, North Carolina. Reynolds was Chief Operating Officer of Port City Java and an agent of Wild Flour Bread Company, LLC during times material to this action.

[8]     Defendant Wild Flour Bread Company, LLC ("Wild Flour") was at times material to this civil action a limited liability company formed under the laws of the State of North Carolina.

II.

PROCEDURAL BACKGROUND

[9]     On August 11, 2006, Plaintiffs filed a Complaint against Defendants alleging five Claims for Relief ("Claim(s)"): First Claim – Misrepresentation, Fraud and Deceit; Second Claim – Negligent Misrepresentation; Third Claim – Unfair and Deceptive Trade Practices; Fourth Claim – Breach of Contract/Breach of Express Warranty and Fifth Claim – Piercing the Corporate Veil.

[10]    On October 6, 2006, Defendants filed an Answer and Counterclaims, raising claims by their Counterclaim for breach of a bakery contract and a franchise agreement. Neither of the Motions raises issues with regard to the Defendants' Counterclaims. Consequently, they are not dealt with in this Order and Opinion, and they remain in place.

[11]    On April 7, 2008, Plaintiffs filed an Amended Complaint to add PCJ Ventures as a party defendant (hereinafter, the court will refer to the Amended Complaint as the "Complaint").

[12]     On July 31, 2008, Plaintiffs filed a Motion for Summary Judgment on all claims.  On August 1, 2008, Defendants filed a cross Motion for Summary Judgment on all claims.  The court heard oral argument on the Motions on November 3, 2008, and the Motions are ripe for determination.

[13]     On February 20, 2009, Defendants filed a Corrected Brief in Support of Defendants' Motion for Summary Judgment ("Corrected Brief").  On February 27, 2009, Plaintiffs filed their Motion to Strike the Defendants' Corrected Brief.

[14]     Unless otherwise indicated herein, the material facts reflected in paragraphs 15 through 29, 38, 39, 47, 53 through 57 and 66 of this Order exist, are undisputed[2] and are pertinent to the issues raised by the Motions.

III.

FACTUAL BACKGROUND

[15]     In July 2005, David L'Heureux and Peter L'Heureux, working together as L'Heureux Enterprises, began searching in Wilmington, North Carolina for a business investment opportunity.  Plaintiffs had planned to purchase a franchise together in an arrangement where Peter L'Heureux would supply the funds for purchase and David L'Heureux would operate the business.

[16]     In August 2005, Plaintiffs contacted Sharon Huffman ("Huffman"), of VR Business Brokers, Inc., concerning a sales listing for Wild Flour.  Huffman was functioning at times material to this action as a sales agent for Wild Flour and Reynolds.  Huffman put Plaintiffs in contact with Reynolds, and the parties began negotiations as to the potential purchase by Plaintiffs of Wild Flour.

---

[2] It is not proper for a trial court to make findings of fact in determining a motion for summary judgment under Rule 56.  However, it is appropriate for a Rule 56 order to reflect material facts that the court concludes exist and are not disputed, and which support the legal conclusions with regard to summary judgment.  *Hyde Ins. Agency v. Dixie Leasing*, 26 N.C. App. 138 (1975).

[17]    At that time, Wild Flour was leasing 4,000 square feet in The Forum Shopping Center, located at 1125 Military Cutoff Road in Wilmington, North Carolina.  In addition to a bakery, Wild Flour operated a Port City Java brand kiosk within the bakery.  The kiosk occupied approximately 150 to 300 square feet of space[3] in the bakery and sold only Port City Java products.  Wild Flour was an unprofitable bakery operation.

[18]    Throughout the course of negotiations, Plaintiffs sought assurances that a Port City Java franchise was included in the sale of Wild Flour.  Plaintiffs' plan had been to purchase Wild Flour and convert the bakery into a full Port City Java franchise coffee house ("PCJ Café") while continuing to supply baked goods to PCJ.

[19]    In a communication between Huffman and David L'Heureux prior to closing, Huffman stated that Plaintiffs should "spend the $50,000 to fix up a really nice Port City Java coffee house inside of Wild Flour."[4]  Huffman later stated that she did not think there would be particular requirements for "the upfit of the coffeehouse" because of the uniqueness of the space.[5]

[20]    On August 16, 2005, Huffman wrote David L'Heureux, telling him he could "expand on the Port City Java coffee house as much as you want within the space. [Reynold]'s estimate is that it would take about 50,000 to upfit the space into a nice PCJ inside the Wildflour space."[6]

[21]    Plaintiffs allege that these communications created the impression that the costs associated with turning Wild Flour into a PCJ Café would be approximately $50,000.  Subsequently, when David L'Heureux requested a guarantee before closing that the cost to turn Wild Flour into a full PCJ Café would only cost $50,000, Reynolds

---

[3] The record is unclear as to the exact square foot area of the kiosk.
[4] Pls.' Mot. Summ. J. Supp. Br., Ex. F.
[5] *Id.*, Ex. G.
[6] *Id.*, Ex. C.

said he would not make any guarantee with regard to specific costs.[7]  The final counteroffer, which Plaintiffs accepted, included a provision stating that "[r]enovations will be as determined by Buyer with suggestions by PCJ corporate officials.  Cost will be entirely dependent on the extent and quality of same."[8]

[22]    Included in the contractual agreements for the sale of Wild Flour (the "Transaction") were a Franchise Agreement[9] and a Uniform Franchise Offering Circular ("UFOC").[10]  The Franchise Agreement made no representations as to the costs required to turn Wild Flour into a PCJ Café and made only oblique reference to the UFOC for franchise requirements.[11]  While the UFOC did not make representations or warranties as to the costs associated with turning Wild Flour into a PCJ Café, it did provide an estimated range for typical costs associated with creating a PCJ Café.[12]  The Franchise Agreement also included a merger clause expressly excluding prior negotiations between parties and language indicating that the documents executed at closing governed the entire agreement.[13]

[23]    On September 26, 2005, prior to signing the Franchise Agreement, Plaintiff David L'Heureux signed a letter acknowledging that he had read the UFOC.[14]  This letter included a provision that no statements or promises that were not authorized

---

[7] Br. Supp. Defs.' Mot. Summ. J., Ex. H.
[8] Pls.' Mot. Summ. J. Supp. Br., Ex. M.
[9] Br. Supp. Defs.' Mot. Summ. J., Ex. F.
[10] Answer Am. Compl., Ex. A.
[11] Although Defendants contend that the Franchise Agreement references the UFOC, the court cannot find any such direct reference.  Rather, the Franchise Agreement does refer to the "Manual," the table of contents of which was provided to Plaintiffs.  Br. Supp. Defs.' Mot. Summ. J., Ex. F.  The absence of a direct reference between the documents notwithstanding, the Plaintiffs received, and are charged with, knowledge of both the Franchise Agreement and the UFOC.
[12] Br. Supp. Defs.' Mot. Summ. J., Ex. F.
[13] Id.
[14] Pls.' Mot. Summ. J. Supp. Br., Ex. B-1.

and which may be untrue, inaccurate or misleading were made to David L'Heureux by PCJ employees or authorized representatives.[15]

[24]    On October 25, 2005, the Transaction closed, and L'Heureux Enterprises purchased the assets of Wild Flour.[16]  These assets included a bakery contract to produce the baked goods for all Wilmington PCJ Café locations and the Franchise Agreement with PCJ Franchising to operate a PCJ Café.[17]

[25]    Plaintiffs subsequently met with David Ports, a PCJ architect.[18]  On October 31, 2005, Ports provided a design proposal, and on November 11, 2005, he provided a budget estimate in the range of $133,025 to $172,325 to upfit the Wild Flour space into a PCJ Café.[19]  On December 6, 2005, David L'Heureux e-mailed Reynolds with regard to the estimated costs.[20]

[26]    Reynolds responded to David L'Heureux's e-mail on December 9, 2005, stating that PCJ is a separate entity from Wild Flour and that operation of the granted PCJ Café must be in conformity with that of all other PCJ Café franchises. [21]

[27]    On December 22, 2005, Huffman e-mailed Reynolds and David L'Heureux, stating her understanding that there would not be a minimum requirement for renovations in order to operate a PCJ Café[22] in the Wild Flour space.

[28]    In early 2006, Plaintiffs ceased operating their business at the existing Wild Flour facility.

[29]    On or about June 5, 2006, Plaintiffs sold Wild Flour for $106,360.[23]

---

[15] *Id.*
[16] Br. Supp. Defs.' Mot. Summ. J., Ex. K.
[17] *Id.*
[18] Pls.' Mot. Summ. J. Supp. Br., § II.  The record is unclear as to whether Ports worked for PCJ, PCJ Franchising or PCJ Ventures.
[19] *Id.*
[20] *Id.*, Ex. O.
[21] *Id.*, Ex. P.
[22] *Id.*, Ex. Q.

IV.

THE MOTIONS – DISCUSSION

[30]  Under Rule 56(c), summary judgment is to be rendered "forthwith" if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.  When the forecast of evidence demonstrates that the plaintiff cannot satisfy an essential element of a claim or overcome an affirmative defense established by the defendant, summary judgment for the defendant should be granted.  *Grayson v. High Point Dev. Ltd. P'ship*, 175 N.C. App. 786, 788 (2006).

[31]  Rule 8(a)(1) provides that a pleading setting forth a claim for relief shall contain "[a] short and plain statement of the claim sufficiently particular to give the court and the parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved showing that the pleader is entitled to relief . . . ."

[32]  The Complaint in this case is drafted awkwardly and contains extensive and unnecessary recitations of evidentiary material that go far beyond the requirements of notice pleading envisioned by Rule 8.  In presenting pleadings containing claims or defenses, counsel is cautioned henceforth to be advertent to the pleading requirements of the Rules.

[33]  The court will examine the Motions in the context of each of Plaintiffs' respective Claims.

---

[23] *Id.*, Ex. Z.

A.

## Plaintiffs' First Claim – Misrepresentation, Fraud and Deceit.

[34]     In substance, Plaintiff's First Claim is stated as a fraud claim.  It is based upon allegations of active fraud, knowing and purposeful misrepresentation and deceit.

[35]     It is well settled in North Carolina that to support a claim for fraud, a plaintiff must prove that there existed (a) false representation or concealment of a material fact; (b) that was reasonably calculated to deceive; (c) that was made with an intent to deceive; (d) did in fact deceive, *i.e.*, was relied upon and (e) resulted in damage to the injured party.  *State Properties, LLC v. Ray*, 155 N.C. App. 65 (2002); *Helms v. Holland*, 124 N.C. App. 629, 634 (1996).

[36]     Further, if there was in fact reliance upon the representation or concealment, an actionable claim for fraud requires the reliance to have been reasonable.  *Johnson v. Owens*, 263 N.C. 754 (1965).

[37]     Reliance is reasonable if the plaintiff has made an independent investigation or if the plaintiff was not informed of the true condition of the subject matter at issue.  Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate, *Calloway v. Wyatt*, 246 N.C. 129 (1957); or if the plaintiff was informed of the true condition of the subject matter.  *Sullivan v. Mebane Packaging Group, Inc.*, 158 N.C. App. 19, 26 (2003); *Jay Group, Ltd. v. Glasgow*, 139 N.C. App. 595 (2000). The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion.  *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214 (1999); *State Properties*,155 N.C. App. at 73.

[38]     Under the undisputed facts of this matter, the court is forced to conclude that Plaintiffs' reliance on any alleged misrepresentations or concealments as a matter of law was unreasonable.  The Plaintiffs signed the Franchise Agreement, and are charged with knowing the true nature of the contractual documents.  Plaintiff David L'Heureux also signed a statement acknowledging that he had read and understood the UFOC.[24]  Defendant Reynolds clearly and explicitly stated in a counteroffer that he could not warrant that the costs of upfitting the kiosk into a PCJ Café would not exceed $50,000.[25] The final contractual documents are not inconsistent with the prior disclaimer.  Had Plaintiffs used reasonable diligence, they would have recognized this consistency.

[39]     Further, Plaintiffs did not use reasonable diligence in relying on the word of Huffman over clearly contrary language in the Franchise Agreement, the UFOC and the Agreement for the Purchase of Assets (the "Sales Contract").[26]  Likewise, e-mail correspondence dated December 22, 2005, from Huffman to David L'Heureux and Reynolds with regard to the "minimum requirement for . . . renovations in order to operate a [PCJ Café] . . ."[27] in the Wild Flour space took place after closing on the sale of Wild Flour to Plaintiffs.  Accordingly, the e-mail could not have been relied upon in Plaintiffs' decision to go forward.

[40]     Plaintiffs' forecast of evidence also fails to support an inference that they (a) were denied an opportunity to investigate the subject matter of the claim, or (b) could not discover the truth about the contract by exercise of reasonable diligence or (c) were induced to forego additional investigation by Reynolds' misrepresentations.  Our courts

---

[24] *Id.*, Ex. B-1.
[25] Br. Supp. Defs.' Mot. Summ. J., Ex. H.
[26] Defs.' Br. Opp. Pl. Mot. Summ. J., Ex. C.
[27] Pls.' Mot. Summ. J. Supp. Br., Ex. Q.

have held that such facts are necessary to support a fraud claim.  *State Properties*, 155 N.C. App. at 73.  *See also*, *Oberlin Capital, LP v. Slavin*, 147 N.C. App. 52, 59-60 (2001); *Hearne v. Statesville Lodge No. 687*, 143 N.C. App. 560 (2001); *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346 (1999).

[41]    Consequently, based upon the undisputed facts of this action, the court is forced to conclude that any reliance by the Plaintiffs upon representations made by or in behalf of one or more of the Defendants was unreasonable.  Therefore, as a matter of law the Plaintiffs cannot prove the reliance element required to support the allegations of misrepresentation, fraud and deceit contained in their First Claim.

[42]    As to this First Claim, there exist no genuine issues as to any material fact, and the Defendants are entitled to summary judgment in their favor with regard to such Claim.

B.

<u>Plaintiffs' Second Claim – Negligent Misrepresentation.</u>

[43]    To support a claim for negligent misrepresentation, a plaintiff must prove that (a) it justifiably relied, (b) to its detriment, (c) upon information prepared by a defendant without reasonable care and (d) that the defendant was one who owed plaintiff a duty of care.  *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 532 (2000).  As is the case with allegations of fraud, reasonable reliance is also a required element of negligent misrepresentation.  *MacFadden v. Louf*, 182 N.C. App. 745, 749 (2007), citing *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 224 (1999).

[44]    As discussed, *supra*, with regard to Plaintiffs' First Claim, the court has concluded that Plaintiffs are not able to demonstrate reasonable reliance with respect to any misrepresentations or concealments by or in behalf of Defendants.

[45]    Consequently, as to this Second Claim, there exist no genuine issues as to any material fact, and the Defendants are entitled to summary judgment in their favor with regard to such Claim.

C.

Plaintiffs' Third Claim – Unfair and Deceptive Trade Practices.

[46]    In order to state a claim for unfair and deceptive trade practices ("UDTP") pursuant to the provisions of N.C. Gen. Stat. Chapter 75, the plaintiff must prove the existence of (a) an unfair or deceptive act or practice or an unfair method of competition (b) in or affecting commerce (c) that proximately caused actual injury.  *Johnson v. Phoenix Mutual Life Ins. Co.*, 300 N.C. 247, 266 (1980) (in order to establish that an act is "unfair," it must "offend established public policy" or be "immoral, unethical, oppressive, unscrupulous, or substantially injurious to a consumer").

[47]    In support of their Third Claim, Plaintiffs rely upon conclusory allegations to the effect that the various Defendants, through Reynolds, made intentional misrepresentations calculated to induce Plaintiffs to enter into the Transaction. However, Plaintiffs have not forecast evidence sufficient to support their allegations of unfair or deceptive acts or practices on the part of Defendants.  Instead, the forecast of undisputed admissible evidence shows that Defendants made no guarantees and provided appropriate disclosures and documents to the Plaintiffs before the Transaction closed.  While the disclosures and documents unfortunately appear not to have been adequately digested, investigated or understood by Plaintiffs, the forecast evidence

does not establish any violation of duty on the part of Defendants to educate Plaintiffs on the plain meaning of the contractual documents involved in the Transaction.

[48]     The Plaintiffs' conclusory allegations of wrongdoing by Defendants are not sufficient.  There must be a forecast of a sufficient evidentiary foundation for each of the elements of a UDTP Claim for it to survive summary judgment dismissal.  *First Atlantic Management Corp. v. Dunlea Realty Co.*, 131 N.C. App. 242 (1998).  Here, based upon the forecast of undisputed evidence, the court is forced to conclude that the evidence does not support Plaintiffs' allegations that Defendants' actions constituted an unfair or deceptive act.

[49]     As to this Third Claim, there exist no genuine issues as to any material fact, and the Defendants are entitled to summary judgment in their favor with regard to such Claim.

D.

Plaintiffs' Fourth Claim – Breach of Contract/Breach of Express Warranty

[50]     In their Fourth Claim, the Plaintiffs allege that Defendants breached certain contractual obligations with regard to Plaintiffs' acquisition of Wild Flour and the Port City Java kiosk, and the prospective upfit of the Port City Java kiosk into a PCJ Café.  The substance of Plaintiffs' contention is that Defendants contractually agreed and/or expressly warranted that the cost of upfitting the Port City Java kiosk into a PCJ Café would not exceed a specified amount, and that Defendants breached this agreement to the financial detriment of Plaintiffs.

[51]     In North Carolina, it is established that a contract is interpreted by examining the language of the entire contract for indicators of the parties' intent at the moment of contract execution.  *State v. Phillip Morris USA, Inc.*, 359 N.C. 763, 773

(2005). This intention is to be gathered from the entire instrument, viewing it from its four corners. *Jones v. Palace Realty Co.*, 226 N.C. 303, 305 (1946). If there is only one reasonable interpretation of the contract, the courts "may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Woods v. Nationwide Mutual Ins. Co.*, 295 N.C. 500, 506 (1978) (applying general contract principles in an insurance contract case). The parol evidence rule precludes admission of extrinsic evidence of prior or contemporaneous negotiations or conversations that contradict such a fully integrated written contract. *Craig v. Kessing*, 297 N.C. 32, 34-35 (1979). Extrinsic evidence is allowed, however, to show that fraud prevented a meeting of the minds and the consequent formation of a contract. *Cunningham v. Brown*, 51 N.C. App. 264, 270 (1981).

[52]     In the instant case, Plaintiffs contend the court should consider a wide range of communications and conversations that took place between them and one or more of Defendants, or their representatives, prior to execution of the contractual documents involved in the Transaction. Plaintiffs contend that Reynolds made fraudulent misrepresentations in order to induce Plaintiffs to purchase Wild Flour. As discussed in the court's analysis of Plaintiffs' First and Second Claims, *supra*, a claim for fraud requires a showing of reasonable reliance; and based upon the forecast of undisputed admissible evidence in this case, the Plaintiffs cannot make a showing of reasonable reliance on any misrepresentations or communications contrary to the contractual documents. As such, the contractual documents may only be read within the meaning of their four corners.

[53]    Neither the Franchise Agreement, the UFOC nor any of the other documents involved in closing of the Transaction contain representations as to the cost necessary to upfit a PCJ Café.  To the contrary, the Franchise Agreement specifically disclaims any warranties as to "the amount which franchisee may be required to expend" with regard to "furniture, furnishings, trade fixtures and furniture, furnishings, trade fixtures (sic) and equipment, food and beverage products, supplies and materials used in connection with" a PCJ Café.[28]  The UFOC estimates, but does not warrant, the initial investment cost to develop a PCJ Café.  The foregoing provisions are stated clearly within the contract documents and stand in direct contradiction to any prior conversations between Plaintiffs and any Defendant or representative thereof speculating the costs of upfitting and renovation.

[54]    Moreover, the Franchise Agreement contains clear and unambiguous merger language, which provides:

> This Agreement, together with the Application, constitutes the entire Agreement of the Parties and supersedes all prior negotiations, commitments, representations and undertakings of the Parties with respect to the subject matter of this Agreement.[29]
>
> . . . .
>
> This Agreement and the documents referred to herein constitute the entire agreement between the Parties hereto with respect to the subject matter hereof, superseding and canceling any and all prior and contemporaneous agreements, understandings, representations, inducements and statements, oral or written, of the parties in connection with the subject matter hereof.[30]

---

[28] Br. Supp. Defs.' Mot. Summ. J., Ex. F, p. 13, ¶ 5.6.
[29] *Id.* at p. 2, ¶ 10.
[30] *Id.* at p. 51, ¶ 26.4.

[55]    The Franchise Agreement also provides that "oral statements made by Franchisor's employees or agents . . . do not constitute warranties."[31]

[56]    Further, the Sales Contract provides that "[no] modifications hereof or other purported agreements of the parties shall be enforceable unless the same are in writing and signed by all parties."[32]

[57]    Plaintiffs, in what the undisputed facts reflect was an arms-length business transaction, had the opportunity to and did review the Franchise Agreement, the UFOC, the Sales Contract and any supporting documents prior to signing the Franchise Agreement and prior to closing on the Transaction.  Specifically, the Franchise Agreement provides, in capitalized letters:

> FRANCHISEE EXPRESSLY ACKNOWLEDGES THAT IT HAS ENTERED INTO THIS FRANCHISE AGREEMENT AS A RESULT OF ITS OWN INDEPENDENT INVESTIGATION AND AFTER CONSULTATION WITH ITS OWN ATTORNEY, AND NOT AS A RESULT OF ANY REPRESENTATIONS OF FRANCHISOR, ITS AGENTS, OFFICERS OR EMPLOYEES, EXCEPT AS CONTAINED HEREIN.[33]

[58]    The forecast of admissible evidence simply does not support either the Plaintiffs' contentions as to construction of the contractual documents arising from the Transaction or their contentions of breach of contract or of express warranty.

[59]    As to this Fourth Claim, there exist no genuine issues as to any material fact, and the Defendants are entitled to summary judgment in their favor with regard to such Claim.

---

[31] *Id.* at p. 13, ¶ 5.6.
[32] Sales Contract, ¶ 18.
[33] Br. Supp. Defs.' Mot. Summ. J., Ex. F, p. 51, ¶ 26.4.

E.

Plaintiffs' Fifth Claim – Piercing the Corporate Veil (Defendant Reynolds).

[60]    Plaintiffs contend that Reynolds should have personal liability for Plaintiffs' first four Claims.  Their theory is that Defendant Wild Flour was the mere instrumentality of Reynolds and that Reynolds therefore should be personally liable for any actionable wrongs or breaches by Wild Flour.

[61]    They argue that the veil of protection typically offered to its members by Wild Flour's limited liability company form of organization under N.C. Gen. Stat. Chapter 57C should be disregarded, or "pierced," in this action as to Reynolds.

[62]    It is well established that in certain circumstances North Carolina will disregard the separate and independent existence of a corporation or limited liability company to hold a shareholder or member liable for the business entity's conduct when necessary to prevent fraud or to achieve equity. 18 Am. Jur. 2d, Corporations § 47 (1008).  However, the North Carolina courts do not invoke this doctrine lightly because it removes legal protections explicitly adopted. *Department of Transp. v. Airlie Park, Inc.*, 156 N.C. App. 63, 68, *appeal dismissed* by 357 N.C. 504, 587 (2003); *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 37, *disc. rev. denied*, 356 N.C. 164 (2002) (quoting *Dorton v. Dorton*, 77 N.C. App. 667, 672 (1985)) (noting that piercing the corporate veil is "'a drastic remedy' and 'should be invoked only in an extreme case where necessary to serve the ends of justice'"); *Cherry v. State Farm Mutual Automobile Ins. Co.*, 162 N.C. App. 535, 542 (2004).  Typically, this remedy is available only when the business entity is acting as the alter ego or the "mere instrumentality" of the member or shareholder.  *B-W Acceptance Corp. v. Spencer*, 268 N.C. 1, 8 (1966).

[63]    Although generally reluctant to invoke this doctrine, our courts recognize three necessary elements required for a "piercing of the veil" claim to go forward. *Glenn v. Wagner*, 313 N.C. 450, 454-55 (1985).  They are:

(a)    A showing of control by the target individual defendant.  This means not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the business entity as to the transaction complained of had at the time no separate mind, will or existence of its own.  *Id.*

(b)    Such control must have been used by the target defendant to commit a fraud or other wrong, to perpetrate the violation of a statutory or other positive legal duty, or to do a dishonest and unjust act in contravention of plaintiff's legal rights.  *Id.*

(c)    The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.  *Id.*

[64]    In assessing such a claim, the court must consider several factors, including (a) adequacy of capitalization of the business entity, (b) non-compliance with corporate formalities, (c) whether there is such complete domination and control of the business entity so that it has no independent identity and (d) whether there is excessive fragmentation of a single enterprise into separate corporations.  *Id.* at 455.

[65]    Here, this court has ruled, *supra*, that none of Plaintiffs' first four Claims are supported by the forecast of undisputed evidence, and that Defendants are entitled to summary judgment in their favor as to such Claims.  Accordingly, there exists no underlying breach of duty to support a piercing claim against Reynolds.

[66]    However, even if any of Plaintiffs' first four Claims were to survive summary judgment, the court is forced to conclude that the evidentiary forecast here does not support this Fifth Claim.  Although Reynolds was an agent of Wild Flower during times material to this action, there is no forecast of evidence that he had complete control over the company.  Rather, Wild Flour was owned by Java Partners, LLC and another member that is not a party defendant to this action.  Moreover, Reynolds owns Java Partners, LLC with at least one other member not a party to this action.[34]

[67]    Furthermore, there is no allegation or showing here that Wild Flour was inadequately capitalized, that Reynolds failed to comply with corporate formalities or that the company was excessively fragmented.  Plaintiffs do allege that Reynolds exercised complete domination and control over Wild Flour to the extent that Wild Flour did not have its own identity.  However, the forecast of admissible evidence does not support that allegation, and the court concludes that these facts do not support application of the doctrine of piercing the corporate veil.

[68]    As to this Fifth Claim, there exist no genuine issues as to any material fact, and Defendant Reynolds is entitled to summary judgment in his favor with regard to such Claim.

V.

CONCLUSION

NOW THEREFORE, based upon the foregoing, it is ORDERED that:

[69]    Defendants' Motion for Summary Judgment is GRANTED as to all Claims stated in the Complaint, and each of said Claims hereby is DISMISSED.

---

[34] Reynolds Dep., p. 37.

[70]   The Plaintiffs' Motion for Summary Judgment in this civil action is DENIED.

[71]   In the discretion of the court, the Plaintiffs' Motion to Strike is DENIED.

[72]   This matter will come before the court for a status conference on Wednesday, October 7, 2009, at 11:00 a.m., in the North Carolina Business Court at 225 Hillsborough Street, Third Floor, Raleigh, North Carolina.[35]

This the 4th day of September, 2009.

---

[35] Note that this is the new Campbell University School of Law location.