Chesson v. Rives, 2016 NCBC 90.

STATE OF NORTH CAROLINA

COUNTY OF DAVIDSON

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 3382

W. CHRISTOPHER CHESSON;
JAMES G. LOVELL; and DAVID D.
FRASER,

Plaintiffs,

v.

W. LEON RIVES; LEON L. RIVES, II;
and RIVES & ASSOCIATES, LLP,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER & OPINION ON MOTIONS FOR
SUMMARY JUDGMENT**

1.      THIS MATTER is before the Court on (1) Defendants' Motion for Partial Summary Judgment ("Defendants' Motion") and (2) Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Motion").   The Court GRANTS IN PART Defendants' Motion and DENIES Plaintiffs' Motion.  The Court will address other pending motions in a subsequent order.

> *Carruthers & Roth, P.A., by Jack B. Bayliss, Jr. and Mark K. York for Plaintiffs.*

> *Sharpless & Stavola, P.A., by Frederick K. Sharpless, for Defendants.*

Gale, Chief Judge.

## I.      THE PARTIES

2.      Plaintiff W. Christopher Chesson ("Chesson") is a licensed certified public accountant ("CPA") who resides in Davidson County, North Carolina.  He is

currently employed by LB&A, Certified Public Accountants, PLLC ("LB&A"), a public accounting firm in Matthews, North Carolina.

3. Plaintiff James G. Lovell ("Lovell") is a licensed CPA who resides in Mecklenburg County, North Carolina. He is licensed to practice law in New York. Lovell is currently employed by LB&A.

4. Defendant William Leon Rives ("William") resides in Davidson County, North Carolina. William has been a licensed CPA since 1978 and is a member of the American Institute of Certified Public Accountants ("AICPA").

5. Defendant Leon L. Rives, II ("Leon"), sometimes referred to as "Little Rives," resides in Davidson County, North Carolina. He has been a licensed CPA since 2002 and is a member of the AICPA.

6. Defendant Rives & Associates, LLP ("RA") was formed in 2004 as a North Carolina limited liability partnership that engages in certified public accounting. RA has offices in Davidson, Mecklenburg, and Wake Counties.

## II. FACTUAL BACKGROUND

7. When reviewing a motion for summary judgment, the Court does not make findings of fact or resolve contested factual issues. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975). The Court may, however, summarize the factual record to provide context for its opinion. *See BDM Invs. v. Lenhil, Inc.*, No. 11-CVS-449, 2014 NCBC LEXIS 32, at *3 (N.C. Super. Ct. July 21, 2014).

## A. RA's Formation and the Partnership Agreement

8.     William and Leon formed RA in 2004.  On September 1, 2007, Chesson joined RA from Dixon Hughes, PLLC ("Dixon Hughes"), and William, Leon, and Chesson executed the RA Partnership Agreement (Leon L. Rives, II Aff. Ex. D ("Partnership Agreement"), at 1, Feb. 9, 2015.)  The Partnership Agreement defines the Founding Partners as William, Leon, and Chesson.  (Partnership Agreement § 1.09.)

9.     Dixon Hughes sued Chesson for breach of his contractual obligation to pay Dixon Hughes one-half of all amounts that he later earned from former Dixon Hughes clients.  In November 2012, Dixon Hughes and Chesson reached a settlement agreement that required payments from Chesson.  RA paid Dixon Hughes with two checks for $75,000 each, which RA contends were loan payments to Chesson.

10.     The Partnership Agreement provides that each of RA's geographic locations serves as a separate division and creates an entity identified as the "Pool," which serves as a de facto holding company.  (Partnership Agreement § 1.08.)  The Pool owns the entire interest in RA's Charlotte Operations.  (Partnership Agreement § 3.01.)  The Pool's ownership is limited to the Founding Partners and allocated 40% to William, 40% to Leon, and 20% to Chesson.  (Partnership Agreement § 3.01.)

11.     The Partnership Agreement contemplates both voting and nonvoting partners.  Only partners who have an ownership interest in the Pool are entitled to a vote, and a partner is "entitled to one (1) vote for each percentage ownership of the Pool."  (Partnership Agreement § 2.06.)

12. The Partnership Agreement provides that RA's management is vested in the partners, who have the option to "delegate responsibilities to a Managing Partner, Executive Team, or Chief Executive Officer." (Partnership Agreement § 2.05.)

**B. RA Admits Lovell and Fraser, but Not as Founding Partners.**

13. A new partner can be admitted to RA "only by unanimous vote of the Partners." (Partnership Agreement § 2.04.) On August 17, 2009, William, Leon, Chesson, and Lovell signed the Addendum to the Partnership Agreement ("Addendum") to admit Lovell as a partner. (Marshall Aff. Ex. O ("Addendum"), at 4, Feb. 9, 2015.) Lovell was given a 0.01% interest in the "Charlotte Operations," as defined in the Partnership Agreement, and a $120,000 annual partnership draw. (Addendum ¶¶ 1, 4.) He did not obtain ownership in the Pool and was never referred to as a Founding Partner.

14. The Addendum expressly incorporates the Partnership Agreement by reference, stating that:

> All terms of the [Partnership] Agreement shall continue to apply to the Partners and the New Partner as members of the Partnership as if the same terms were fully set forth herein, and the New Partner, by execution of this agreement, agrees to be bound by the terms and conditions of the [Partnership] Agreement.

(Addendum ¶ 3.) Lovell read the Addendum but did not request to see the Partnership Agreement before signing the Addendum. (Lovell Dep. 30:6–13, Feb. 5, 2014.) Lovell first read the Partnership Agreement either just before or just after he left RA in 2012. (Lovell Dep. 30:14–31:2, Feb. 5, 2014.)

15. The Addendum includes a term that provides that if Lovell's partnership with RA terminates for any reason and Lovell thereafter "compete[s] with [RA] . . . by performing work for clients of [RA]," Lovell is required to pay RA a percentage of the fees that he bills to those clients for a period of two years ("Addendum Competition Provision"). (Addendum ¶ 5.) More specifically, the Addendum Competition Provision obligates Lovell to pay "fifty percent (50%) of the gross fees billed or received by either [Lovell], his partnership, or a corporation in which he is a stockholder or by any business entity by which he is employed in the field of public accounting." (Addendum ¶ 5.) Such payments are due "whether or not the fees are collected by [Lovell], his partnership, or his corporation or his employer." (Addendum ¶ 5.)

16. On the same day Lovell signed the Addendum, David Fraser ("Fraser"), who had been an RA employee since December 2007, signed a substantially similar addendum and was admitted as a partner. (*See* Marshall Aff. Ex. N ("Fraser Addendum"), Feb. 9, 2015.) Prior to Fraser signing the Fraser Addendum, Leon had stated in an internal memo that he wanted to "remove Dave [Fraser] from the firm" in order to improve the Charlotte office's profitability. (*See* Marshall Aff. Ex. R ("Rives Memo"), Feb. 9, 2015.) While Fraser was an employee, before he became a partner, he was not subject to the Addendum Competition Provision or to any other provision regarding competition. Fraser was not advised of the Rives Memo or of Leon's intent before he signed the Fraser Addendum.

C. **Plaintiffs Assert that Leon Violated Professional Standards and Failed to Afford Lovell Rights He was Entitled to as a Partner.**

17.     All RA partners are CPAs licensed in North Carolina and are therefore subject to the practice standards established by the North Carolina State Board of Certified Public Accountant Examiners ("Board Standards").  Plaintiffs assert that William and Leon violated Board Standards and endorsed or acquiesced in other RA employees' violations of Board Standards, including but not limited to actions in connection with an audit of at least one significant client.  At the time of that audit, Lovell oversaw RA's audits and had the most experience of anyone at RA regarding that specific type of audit.  However, Lovell was excluded from participating in the audit.  Lovell contends that Leon and William ignored his expressed concerns and approved an audit opinion that did not comport with applicable professional standards, which ultimately resulted in litigation against RA.

18.     Plaintiffs further complain that Leon violated professional independence standards by forming and operating School Efficiency Consultants, LLC ("Consultants") as a subsidiary of RA and providing audit services for Consultants' clients on a contingency-fee basis.

19.     Lovell further complains that Leon and William wrongfully excluded him from RA's management despite his being a partner.  More specifically, Lovell complains that he was not provided access to RA's books and records.  He also complains that he was not allowed to vote on partnership matters but does not point to any Partnership Agreement provision that grants him voting rights.

**D. Plaintiffs Plan to Leave RA and Call for RA to Expel Leon as an RA Partner**

20.     In July 2012, Lovell and Fraser met with John Bly ("Bly"), a partner at LB&A, to discuss the possibilities that Bly might purchase RA's Charlotte office or that Fraser and Lovell might leave RA to join LB&A. (Bly Dep. 27:16–29:8, 37:4–38:20, Oct. 21, 2014.) Fraser and Lovell expressed their belief to Bly that the ethical violations at RA should allow them to avoid any efforts to enforce the Addendum Competition Provisions. (Bly Dep. 54:7–55:21, Oct. 21, 2014.)

21.     Chesson began attending meetings with Lovell, Fraser, and Bly in September 2012. Chesson sent Bly a spreadsheet that contained the names and contact information of Chesson's RA clients.

22.     After the meetings with LB&A, Plaintiffs and their attorneys met with William and Leon on September 24, 2012, and expressed concerns about the audit discussed above, Defendants' failure to adhere to Board Standards, and conflicts of interest related to RA and Leon's relationship with Consultants. (Chesson Aff. ¶ 4, Feb. 9, 2015.) Plaintiffs called upon Leon and William to take actions to correct these issues.

23.     In the days following the September 24 meeting, Plaintiffs requested that Leon resign from RA. Plaintiffs characterize their request as a call to expel Leon. (Pls.' Mem. Opp'n to Defs.' Mot. Partial Summ. J. Ex. QQ.) However, the record does not reflect that any meeting to expel Leon was requested or that any motion to expel was presented for a vote.

24. A partner can be expelled for any reason by a two-thirds vote "of all of the Partners excluding therefrom the vote of the Partner whose expulsion is under consideration." (Partnership Agreement § 7.02.) Additionally, "there will be a vote of expulsion" if a partner commits any one of the eight unacceptable acts enumerated in subsections 7.02(A)–(H) of the Partnership Agreement, unless the partners determine that expulsion is not necessary. (Partnership Agreement § 7.02(A)–(H).) The unacceptable acts include but are not limited to violations of Board Standards, acts of professional misconduct, and acts that constitute gross negligence. (*See* Partnership Agreement § 7.02(B), (H).)

25. On September 26, 2012, Plaintiffs' counsel wrote an e-mail to William with a list of demands, including that Leon resign and that Lovell become RA's interim managing partner, suggesting that litigation would follow if these steps were not taken. (Pls.' Mem. Opp'n to Defs.' Mot. Partial Summ. J. Ex. QQ.) Defendants contend that Plaintiffs' counsel also threatened to destroy Defendants' reputation if Defendants did not relieve Plaintiffs of their contractual obligations upon their withdrawal. (William Rives Dep. 135:19–138:23, June 5, 2014.)

26. Leon did not resign, and William took no action to support Plaintiffs' effort to expel Leon.

27. Defendants assert that, on October 3, 2012, Fraser e-mailed Bly a list of all Fraser's Charlotte tax clients and their contact information, and that the next day, Plaintiffs deleted their RA e-mail inboxes and wiped their RA computers.

28. The Partnership Agreement requires a partner to provide four months' written notice to effectively withdraw from RA. (Partnership Agreement § 7.01.) A withdrawing partner is prohibited from contacting RA clients during the four-month notice period. (Partnership Agreement § 7.03.)

29. On October 5, 2012, Plaintiffs notified Defendants that they were immediately withdrawing from RA. They had not given prior notice. Each then became an LB&A partner. Only a few days after Plaintiffs withdrew from RA, LB&A sent announcement letters to the clients that Chesson identified in his spreadsheet, and Plaintiffs began contacting their former RA clients. Plaintiffs contend that they were not subject to the Partnership Agreement's restrictions.

30. Plaintiffs filed this suit on October 25, 2012. Plaintiffs' counsel then distributed copies of the complaint to several RA clients. (*See* Marshall Aff. Ex. Y, Feb. 9, 2015.) Facts are disputed as to whether the RA clients who received the complaint specifically requested it, and whether those same clients relied on the allegations in the complaint when deciding to discontinue their use of RA's services.

31. Lovell has not paid RA for the work he performed for former RA clients. Defendants have demanded such payment pursuant to the Addendum Competition Provision. Defendants have not paid Lovell or Chesson any value for their partnership interests as provided by section 7.05 of the Partnership Agreement, because Defendants contend that Plaintiffs forfeited their rights to receive such withdrawal payments by failing to provide the requisite notice of withdrawal and improperly contacting RA clients during the notice period.

## III. PROCEDURAL HISTORY

32. Plaintiffs filed their original Complaint on October 25, 2012. Defendants filed a notice of designation on December 17, 2012. The action was designated a mandatory complex business case on December 19, 2012, by then-Chief Justice of the North Carolina Supreme Court Sarah Parker, and assigned to the undersigned on December 20, 2012.

33. Defendants moved to dismiss all claims on January 18, 2013. Plaintiffs, with leave of the Court, filed their First Amended Complaint on April 1, 2013. Defendants then renewed their motion to dismiss, which the Court granted in part on October 29, 2013.

34. Defendants filed their answer, motion to strike, and counterclaims on December 18, 2013. Plaintiffs moved to dismiss two of the six counterclaims. The Court denied the motion on July 2, 2014.

35. Plaintiffs, with leave of the Court, filed their Second Amended Complaint on October 29, 2014, alleging eight claims. All claims by, and counterclaims against, Fraser were voluntarily dismissed on March 8, 2016. The remaining claims include (1) Plaintiffs' claim for information and accounting against RA; (2) Plaintiffs' breach of fiduciary duty claim against William and Leon; (3) Lovell's fraud in the inducement claim against Leon and RA; (4) Lovell's common law fraud claim against Leon and RA; (5) Chesson's breach of contract claim against all Defendants; (6) Lovell's declaratory judgment claim against all Defendants; (7)

Lovell's breach of contract claim against Leon and RA; and (8) Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing against all Defendants.

36. Defendants filed their answer to the Second Amended Complaint and counterclaims on November 24, 2014. The counterclaims include (1) RA's claim for money had and received against Chesson; (2) William's claim for money had and received against Chesson; (3) RA's abuse of process claim against all Plaintiffs; (4) all Defendants' claims of obstruction of justice, trespass to chattel, and breach of fiduciary duty against all Plaintiffs based on destruction of computer information; (5) all Defendants' claims of breach of the partnership agreement and breach of fiduciary duty against all Plaintiffs; and (6) all Defendants' claim for accounting against all Plaintiffs.

37. Plaintiffs and Defendants filed cross-motions for summary judgment on February 9, 2015. The motions are ripe for determination.

## IV. ANALYSIS

38. Plaintiffs move for partial summary judgment in their favor on their claims for fraud in the inducement and declaratory judgment, and for partial summary judgment against Defendants on their counterclaims for abuse of process and breach of contract. Defendants move for summary judgment against Plaintiffs on all of Plaintiffs' claims, and for partial summary judgment in their favor on RA's counterclaim for money had and received against Chesson and on Defendants' breach of contract counterclaim against Plaintiffs, which would likely negate the need for an accounting.

39. Each of the motions for summary judgment were timely filed and briefed.

## A. Standard of Review

40. When moving for summary judgment under Rule 56 of the North Carolina Rules of Civil Procedure ("Rules"), the movant bears the burden of showing that there is no genuine issue of material fact with respect to the essential elements of a claim or defense and that the movant is entitled to judgment as a matter of law. *See Steel Creek Dev. Corp. v. James*, 300 N.C. 631, 636–37, 268 S.E.2d 205, 209 (1980). To overcome a motion for summary judgment appropriately made and supported, the nonmovant bears the burden "to present a forecast of evidence which shows that a genuine issue of fact exists." *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 75 N.C. App. 1, 6, 330 S.E.2d 242, 247 (1985), *aff'd in part, rev'd in part*, 317 N.C. 110, 343 S.E.2d 879 (1986). The Court views the evidence in the light most favorable to the nonmovant. *See Coats v. Jones*, 63 N.C. App. 151, 154, 303 S.E.2d 655, 657 (1983).

## B. The Partnership Agreement and the Addendum Are Valid Contracts That May Be Enforced Against Lovell.

41. The Court must first address Lovell's contention that the Partnership Agreement and the Addendum cannot be enforced against him, because first, he was fraudulently induced to sign the Addendum, and second, his contract was not supported by valuable consideration because the promise of his partnership was illusory.

42. To prevail on a claim of fraudulent inducement, a party must prove "(1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ward v. Fogel*, 237 N.C. App. 570, 581, 768 S.E.2d 292, 301 (2014) (quoting *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 453, 678 S.E.2d 671, 684 (2009)). Even when analyzing the facts in the light most favorable to him, the uncontested facts demonstrate that Lovell is unable to maintain a claim for fraudulent inducement.

43. Lovell first contends that Leon fraudulently induced him to sign the Addendum when Leon failed to disclose the existence and content of the Rives Memo. When a fraud claim is based on a party's failure to disclose a material fact, the party accused of fraud must have had a duty to speak or have taken steps to actively conceal facts. *See Setzer v. Old Republic Life Ins. Co.*, 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962). A duty to speak exists

> (1) in the context of a fiduciary relationship, (2) where "a party has taken affirmative steps to conceal material facts from the other," or (3) "where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence."

*Jacobson v. Walsh*, No. 10-CVS-9619, 2014 NCBC LEXIS 2, at *16–17 (N.C. Super. Ct. Jan. 22, 2014) (quoting *Harton v. Harton*, 81 N.C. App. 295, 297–98, 344 S.E.2d 117, 119 (1986)).

44. It is uncontested that Leon did not disclose the Rives Memo to Lovell, but there has been no showing that he had a duty to do so. At the time the parties

entered into the contract, Leon and Lovell did not have a fiduciary relationship. Further, the Rives Memo did not contain material facts relevant to Lovell, as it only discussed Fraser. There is no evidence that Leon took affirmative steps to conceal the Rives Memo. The Court rejects Lovell's contention that the Rives Memo contains material facts relevant to Lovell's election to execute the partnership documents, because the Rives Memo provides insight into Leon's business practices and would have influenced Lovell's decision to join RA. The Rives Memo did not reveal a latent defect in the agreements that Lovell elected to enter into. Significantly, RA never implemented any plan that may be evidenced by the Rives Memo. Therefore, Lovell cannot claim that he was fraudulently induced to sign the Addendum on the basis that the content of the Rives Memo was not disclosed to him.

45. Next, Lovell attempts to support a claim of fraudulent inducement on the basis that he was not provided with a copy of the Partnership Agreement before he executed the Addendum. Effectively, he asks to be excused from his contractual obligations because of his failure to request a copy of and to read the Partnership Agreement. However, the clear and unambiguous language of the Addendum specifies that the terms of the Partnership Agreement were incorporated into and made a part of the terms of the Addendum. (*See* Addendum ¶ 3.)

46. Lovell cannot reasonably contend that he detrimentally relied on Defendants' failure to affirmatively offer him an opportunity to review the Partnership Agreement before he executed the Addendum. "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through

reasonable diligence, but failed to investigate." *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 90, 747 S.E.2d 220, 227 (2013) (quoting *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 26, 581 S.E.2d 452, 458 (2003)). While questions regarding reasonableness of a party's reliance and the materiality of the misrepresented or omitted fact may often present an issue that must be evaluated by a jury, *see Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007), reasonableness can be determined as a matter of law when "the facts are so clear that they support only one conclusion," *State Props., LLC v. Ray*, 155 N.C. App. 65, 73, 574 S.E.2d 180, 186 (2002). That is the case here.

47. In *Sullivan v. Mebane Packaging Group., Inc.*, the North Carolina Court of Appeals held that a plaintiff could not, as a matter of law, prevail on a fraud claim "based on allegations that defendants both concealed and misrepresented his rights under the Agreement" when the plaintiff "requested a copy of the Agreement" but never received it. 158 N.C. App. at 27, 581 S.E.2d at 458–59. "Such a request, absent more, does not constitute reasonable diligence." *Id.* at 27, 581 S.E.2d at 459. The holding in *Sullivan* applies squarely to this case and precludes Lovell's assertion of reasonable reliance.

48. Lovell never requested a copy of the Partnership Agreement before he signed the Addendum. (Lovell Dep. 30:6–13, Feb. 5, 2014.) He has presented no evidence that Defendants refused any such request. Lovell cannot reasonably contend he is surprised by the Addendum Competition Provision. The Addendum clearly states that if Lovell withdraws from RA and then competes with RA, he would

be required to pay RA a percentage of any fees he earns from RA clients. (Addendum ¶ 5.) Lovell cannot avoid those terms through his contention that he was misled to believe that the Addendum Competition Provision applied to all of RA's partners. The Addendum Competition Provision specifically refers only to the "New Partner," without ever mentioning the other partners. (Addendum ¶ 5.) The fact that the Partnership Agreement itself does not have a provision comparable to the Addendum Competition Provision would have been evident from reading the Partnership Agreement. In sum, Lovell cannot claim, as a matter of law, that he was fraudulently induced to sign the Addendum on the basis that he was not given a copy of the Partnership Agreement before he signed the Addendum.

49. Lovell also contends that he was fraudulently induced to sign the Addendum because Leon misrepresented that Lovell would be treated as a full equity partner. Again, Lovell is a victim of his own choice not to read the Partnership Agreement, which clearly discloses that he would not be admitted as a full equity partner with the same rights as the Founding Partners. (*See* Partnership Agreement § 2.06; Addendum ¶ 1.) Evidence that Leon may not have treated Lovell in accordance with the Partnership Agreement may be relevant to Lovell's breach of contract claim, but it does not provide a basis for his claim of fraudulent inducement. *See Williams v. Williams*, 220 N.C. 806, 810, 18 S.E.2d 364, 366 (1942) (explaining that "mere unfulfilled promises cannot be made the basis for an action of fraud").

50. Lovell also asserts a claim of common law fraud in the alternative to his claim of fraudulent inducement. The alternative claim is based on the same grounds

as his fraudulent inducement claim, and like the inducement claim, requires reasonable reliance. The Court concludes and holds that Lovell's common law fraud claim cannot survive because the uncontested record reveals that Lovell cannot prove the necessary element of reasonable reliance. Therefore, the Court concludes that Lovell's fraudulent inducement and common law fraud claims must be DISMISSED.

51. In addition to claiming that the Addendum cannot be enforced against him because his entry into that agreement was fraudulently induced, Lovell contends that the Addendum is unenforceable because it was not supported by consideration, because the promise of being treated as a partner was illusory. A contract must be supported by consideration to be enforceable. *Inv. Props. of Asheville, Inc. v. Norburn*, 281 N.C. 191, 195, 188 S.E.2d 342, 345 (1972). "It is well established that any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee, is sufficient consideration to support a contract." *Brenner v. Little Red Sch. House, Ltd.*, 302 N.C. 207, 215, 274 S.E.2d 206, 212 (1981). "In order to defeat a contract for failure of consideration, the failure of consideration must be complete and total." *Harllee v. Harllee*, 151 N.C. App. 40, 49, 565 S.E.2d 678, 683 (2002).

52. The Addendum provides that, as a partner, Lovell was entitled to 0.01% of the gains and losses of RA's Charlotte Operations and a draw of $120,000 per year. (Addendum ¶¶ 1, 4.) The Addendum incorporates the Partnership Agreement, which provides for other rights and expectations. Until he withdrew from RA, Lovell performed under the Addendum and the Partnership Agreement. He represented

himself as a partner in e-mails and to clients. He received his partnership draw. Therefore, there was consideration adequate to support the Addendum.

53. In sum, the Court concludes that there is no issue of material fact that precludes the determination, as a matter of law, that Lovell entered into both the Partnership Agreement and the Addendum without any fraudulent inducement, and that the agreements are valid, supported by reasonable consideration, and may be enforced against Lovell, absent other defenses. Accordingly, Lovell's claim for a declaration that the Partnership Agreement and the Addendum are unlawful is DISMISSED. The Court then turns to Lovell's defense that the Addendum Competition Provision fails as an unenforceable restrictive covenant.

## C. The Addendum Competition Provision Is Not Void as an Improper Covenant Against Competition.

54. Lovell contends that the Addendum Competition Provision is an unenforceable restrictive covenant. Defendants counter that the provision does not restrict Lovell from competing, but instead fairly allocates responsibility for damage to RA as a result of its loss of clients by reason of Lovell's choice to directly compete with RA.

55. North Carolina's appellate courts have interpreted contractual provisions that provide for payment of revenues by a former partner or employee resulting from competitive activities differently and less stringently than covenants that actually preclude competition. "A restriction in the contract which does not *preclude* the employee from engaging in competitive activity, but simply provides for the loss of rights or privileges if he does so is not in restraint of trade. . . ." *E. Carolina*

*Internal Med., P.A. v. Faidas*, 149 N.C. App. 940, 944, 564 S.E.2d 53, 55 (quoting *Newman v. Raleigh Internal Med. Assocs., P.A.*, 88 N.C. App. 95, 100, 362 S.E.2d 623, 626 (1987)), *aff'd per curiam*, 356 N.C. 607, 572 S.E.2d 780 (2002). This type of provision is "not subject . . . to the strict scrutiny as to reasonableness and public policy required with a covenant not to compete." *Id.* at 945, 564 S.E.2d at 56 (holding that a cost-sharing provision that is triggered only if the defendant chooses to compete with the plaintiff is not treated as a restrictive covenant).

56. The Addendum Competition Provision is remarkably similar to the provision upheld by the North Carolina Court of Appeals in *Dixon, Odom & Co. v. Sledge*, 59 N.C. App. 280, 296 S.E.2d 512 (1982). There, an accounting firm and a partner executed a written agreement that the withdrawing partner was required to pay the firm 50% of all fees earned from any client who was a client of the firm during the two years prior to the partner's departure, subject to certain limitations. *Id.* at 284, 296 S.E.2d at 515. The court of appeals upheld the provision against a challenge that it was an improper covenant not to compete, finding that "[t]he contract simply describes the obligations of the parties with regard to . . . [the] division of fees which [the defendant] obtained from 'former clients.'" *Id.* Because the provision did not restrict the type of work that the former partner could conduct or the territory in which the former partner could work, the strict rules of construction that govern covenants against competition did not apply. *Id.*

57. The Court concludes that the holding in *Dixon, Odom & Co.* is controlling. Accordingly, Lovell's Addendum Competition Provision, which does not

prohibit Lovell from competing with RA but requires him to pay RA if he performs work for RA's former clients, is not an improper covenant not to compete.

58. The Court also rejects Lovell's alternative argument that the Addendum Competition Provision is an unenforceable penalty rather than a liquidated damages provision. *See Knutton v. Cofield*, 273 N.C. 355, 361, 160 S.E.2d 29, 34 (1968) (noting that liquidated damages are compensation for injuries in the event of a breach, and a penalty is a punishment designed as a threat to prevent a breach). The Addendum does not prohibit Lovell from competing with RA or soliciting RA's clients. Further, the Addendum Competition Provision does not impose a specific monetary penalty. Rather, the provision expressly allows Lovell to compete with RA but provides that he must pay RA 50% of the total fees that he or his new employer bill former RA clients for a period of two years. Lovell and his new firm control whether they will compete with RA by providing services to former RA clients, and if so, to what degree. Thus, the Court concludes that the Addendum Competition Provision is not an unenforceable penalty.

59. For similar reasons, the Court finds inapposite any argument that the Addendum Competition Provision is unconscionable. A contract term is unconscionable only if "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Brenner*, 302 N.C. at 213, 274 S.E.2d at 210. Seeking to satisfy this exacting standard, Lovell argues that the Addendum

Competition Provision is not reasonably proportionate to any loss suffered by RA. In response, Defendants maintain that the provision is reasonable because it reflects a standard valuation methodology used in the accounting profession for the purchase of accounting firms, which values CPA firms at one times their annual billings. (*See* Bly Dep. 37:1–14, Oct. 21, 2014.) Defendants further note that Chesson had a similar provision in his employment contract with his former employer, Dixon Hughes.

60.     The Court is unable to find a basis to conclude that the Addendum Competition Provision is so one-sided as to "shock the judgment" of a person of common sense. *Brenner*, 302 N.C. at 213, 274 S.E.2d at 210. Accordingly, the Court holds, as a matter of law, that the Addendum Competition Provision is a valid and enforceable term of the overall agreement between Lovell and RA.

**D. Construction of Other Contract Terms on Which the Parties' Claims and Counterclaims Are Based**

61.     To resolve the various claims and counterclaims, the Court must determine whether it can ascertain the meaning of certain terms embodied in the Partnership Agreement, as a matter of law. The Court interprets contract terms as a matter of law when the contract "is plain and unambiguous on its face." *Int'l Paper Co. v. Corporex Constructors, Inc.*, 96 N.C. App. 312, 317, 385 S.E.2d 553, 556 (1989). However, when a contract term is "fairly and reasonably susceptible to either of the constructions asserted by the parties," the term is ambiguous, and its interpretation must be reserved for the jury. *Maddox v. Colonial Life & Accident Ins. Co.*, 303 N.C. 648, 650, 280 S.E.2d 907, 908 (1981). "An ambiguity can exist when, even though the words themselves appear clear, the specific facts of the case create more than one

*reasonable* interpretation of the contractual provisions." *Register v. White*, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004) (emphasis added).

(1) <u>There are terms of the Partnership Agreement that are clear and unambiguous and can be applied as a matter of law.</u>

62.     The voting provision of the Partnership Agreement provides that "[e]ach Partner shall be entitled to one (1) vote for each percentage ownership of the Pool." (Partnership Agreement § 2.06.)  This language is clear and unambiguous on its face. It provides that, of the parties, only William, Leon, and Chesson had a right to vote, because they were the only partners with an ownership interest in the Pool. (Partnership Agreement § 3.01.)  Lovell never had any ownership interest in the Pool and thus had no right to vote.  (Addendum ¶ 1.)

63.     The Partnership Agreement also is unambiguous when it specifies that RA's management "shall be vested in the Partners." (Partnership Agreement § 2.05.) The partners "*may* delegate responsibilities to a Managing Partner, Executive Team, or Chief Executive Officer."  (Partnership Agreement § 2.05 (emphasis added).) Section 2.05 must be read in connection with section 2.06, which states that "[a]ll issues shall be determined by a 2/3 vote." (Partnership Agreement § 2.06.)  Leon and William together owned 80% of the interest in the Pool, and thus collectively controlled more than two-thirds of the partners' votes, which effectively gave them control of RA.  (Partnership Agreement §§ 2.06, 3.01.)

64.     The Partnership Agreement is also unambiguous in providing each partner with a right to inspect RA's books and records, regardless of ownership interest.  (*See* Partnership Agreement § 13.01).  "Partners," as used here, includes

"the signatories to [the Partnership Agreement] and such additional certified public accountants or persons as the [sic] Partners shall from time to time elect." (Partnership Agreement § 2.01.) The Partnership Agreement then clearly provides that all the partners, including Lovell, had a right to inspect RA's books and records.

65. The Partnership Agreement also includes a clearly stated provision that requires a partner to provide four months' written notice to withdraw, unless two-thirds of the partners vote to allow the withdrawing partner to "accelerate the effective date of the withdrawal" ("Notice Provision"). (Partnership Agreement § 7.01.) The Partnership Agreement further provides that a withdrawing partner is not permitted to "contact, solicit, or send announcements to any clients regarding such withdrawal" until RA has mailed a letter "to clients for which the withdrawing . . . Partner had been designated as the originating, responsible, or billing Accountant" ("Client Contact Provision"). (Partnership Agreement § 7.03.) This notification letter must be sent to the affected clients within thirty days of the date that the withdrawing partner gives his notice. (Partnership Agreement § 7.03.) These terms are not ambiguous.

66. The Partnership Agreement provides that a withdrawing partner "shall be paid the value of his or her Partnership interest as determined in Section[] 7.05." (Partnership Agreement § 7.01.) Section 7.05 is titled "Amounts to be Paid to a Withdrawing or Expelled Partner," but its substantive text explicitly refers only to amounts to be paid to an expelled partner. (Partnership Agreement § 7.05.) The parties each acknowledge that the provision provides the method for calculating the

amount to be paid "in equal monthly installments over a seven year period" to a withdrawing partner. (Partnership Agreement § 7.05(D).) The provision further specifies that the withdrawing partner cannot "directly or indirectly induce any former client to patronize any other accounting firm" during the time in which he receives withdrawal payments. (Partnership Agreement § 7.05(E).) These terms are not ambiguous.

(2) <u>As worded, section 7.02 regarding expulsion did not require William to vote in favor of expelling Leon.</u>

67. Plaintiffs contend that section 7.02 of the Partnership Agreement required William to vote in favor of expelling Leon from the partnership once confronted with evidence that Leon engaged in acts that the partners have agreed are unacceptable. As such, Plaintiffs assert that William's failure to agree to expel Leon constituted a breach of contract, which allowed Plaintiffs to withdraw from the partnership free of any obligation to comply with the Notice Provision, the Client Contact Provision, or the Addendum Competition Provision.

68. Solely for purposes of this analysis, the Court assumes, without deciding, that Plaintiffs can prove that Leon engaged in the conduct proscribed as unacceptable by section 7.02 of the Partnership Agreement. The issue is whether the language of the Partnership Agreement can be construed to impose on William an obligation, rather than an option, to vote in favor of expelling Leon because of such conduct.

69. Section 7.02 lists eight specific acts that the "Partners have agreed . . . are unacceptable to the Firm." (Partnership Agreement § 7.02.) However,

section 7.02's language does not expressly state that a partner's engaging in such conduct is a breach of the Partnership Agreement. Rather, section 7.02 allows for a partner's expulsion for engaging in such conduct.

70. Section 7.02 provides that a partner may be expelled without notice "by 2/3 vote of all of the Partners excluding therefrom the vote of the Partner whose expulsion is under consideration." (Partnership Agreement § 7.02.) Section 7.02 further states that, "unless otherwise determined by the Partners, there will be a vote of expulsion if such Partner" commits one of the eight listed unacceptable acts. (Partnership Agreement § 7.02(A)–(H).) The Partnership Agreement does not further define the basis on which the unaffected partners might "otherwise determine[]" not to expel. (Partnership Agreement § 7.02.)

71. Plaintiffs requested that Leon resign. They now claim that this request should be deemed the equivalent of a demand for a partnership vote of expulsion. However, there is no record that Chesson presented a motion to expel or called for a vote. At that time, the partnership voting percentage was 40% to William, 40% to Leon, and 20% to Chesson. If Leon's percentage is disregarded, as required under section 7.02, William effectively controlled two-thirds of the required vote.

72. The Court concludes that section 7.02's language, though not a model of clarity, should be construed by the Court rather than being left for a jury's determination, because section 7.02 is not "reasonably susceptible" to Plaintiffs' interpretation. *Maddox*, 303 N.C. at 650, 280 S.E.2d at 908. Plaintiffs' interpretation would unreasonably allow Chesson, because of his control of the remaining one-third

interest, to preclude two-thirds of the partners from "otherwise determin[ing]" not to proceed with a vote of expulsion. (Partnership Agreement § 7.02.) That interpretation contravenes the express language in section 7.02 that expulsion is determined by a two-thirds vote, (Partnership Agreement § 7.02,) and the language in section 2.06 that specifically provides that "[a]ll issues shall be determined by a 2/3 vote," (Partnership Agreement § 2.06.) Accordingly, the Court concludes, as a matter of law, that William was not contractually required to vote in favor of expelling Leon, and thus, his failure to do so was not an antecedent breach that excused Plaintiffs from performing under the Partnership Agreement.

### E. Defendants Did Not Otherwise Materially Breach the Partnership Agreement Excusing Plaintiffs from Performing under the Agreements.

73. The Court turns to its consideration of whether Defendants otherwise breached the Partnership Agreement and thus excused Plaintiffs from performing their duties under valid provisions of their agreements. The Court must determine whether, when construing the facts in the light most favorable to Plaintiffs, there are issues of material fact that preclude a finding that Defendants did not breach the Partnership Agreement as a matter of law. *See Steel Creek Dev. Corp.*, 300 N.C. at 636–37, 268 S.E.2d at 209.

74. Plaintiffs contend that they were excused from performing their obligations to provide the requisite notice of withdrawal, to refrain from certain conduct with respect to RA's clients during the notice period, and to make payments pursuant to the Addendum Competition Provision, because Defendants first breached the Partnership Agreement in any one of the following ways:

(1) Leon and William refused to give Lovell access to RA's books and records;

(2) Leon and William refused to allow Lovell to vote and participate in RA's management;

(3) Leon violated Board Standards in connection with both the above-mentioned audit and the formation and operation of Consultants;

(4) William refused to expel Leon after being informed of Leon's misconduct; and

(5) Collectively, by these acts, Leon and William breached the implied covenant of good faith and fair dealing.

The Court has above rejected the fourth contention related to an expulsion vote.

75. The Partnership Agreement clearly provides Lovell with a right to inspect RA's books and records. (*See* Partnership Agreement § 13.01.) Defendants do not dispute that Lovell was denied access to RA's books and records. (*See* RA 30(b)(6) Dep. 251:7–252:18, June 4, 2014.) Therefore, Defendants are not entitled to summary judgment against Lovell on this breach of contract claim.

76. However, the Court concludes that Defendants' failure to allow Lovell to inspect RA's books and records did not constitute an antecedent breach that excused Lovell's further obligation to perform under the agreements. A breach discharges further performance only if the breach was material. *See Crosby v. Bowers*, 87 N.C. App. 338, 345, 361 S.E.2d 97, 102 (1987). A material breach is "one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Supplee v. Miller-Motte*

*Bus. Coll., Inc.*, 239 N.C. App. 208, 220, 768 S.E.2d 582, 593 (2015) (quoting *Long v. Long*, 160 N.C. App. 664, 668, 588 S.E.2d 1, 4 (2003)). The Court can determine materiality, as a matter of law, where it is clear based on the circumstances that the breach does not constitute "a substantial failure to perform." *Id.*; *see also Combined Ins. Co. v. McDonald*, 36 N.C. App. 179, 184, 243 S.E.2d 817, 820 (1978) (holding that an employer's failure to comply with the notice of termination provision of the employment contract, on its own, "does not as a matter of law constitute a material breach"). The Court concludes that a failure to allow an inspection of books and records, based on the facts of this case, is not a material breach that excuses Lovell from performing substantive undertakings of the Partnership Agreement and the Addendum.

77. The Court concludes that Defendants are entitled to summary judgment that Defendants did not breach the Partnership Agreement by refusing to allow Lovell to vote and participate in RA's management. The unambiguous language of the Partnership Agreement afforded Lovell no voting right. (*See* Partnership Agreement § 2.06.) In addition to giving William and Leon discretion as to how to delegate management responsibility, the Partnership Agreement "bars claims based on disagreements with managerial decisions unless the effect of those decisions violated fiduciary duties that cannot be eliminated by the Partnership Agreement." *Chesson v. Rives*, No. 12-CVS-3382, 2013 NCBC LEXIS 46, at *12 (N.C. Super. Ct. Oct. 28, 2013).

78.     The Court further concludes that the wording of section 7.02 of the Partnership Agreement cannot be construed to provide that Leon's violation of professional standards, even if proven, directly constitutes a breach of the Partnership Agreement. Those acts may have subjected Leon to expulsion, but his acts did not independently constitute a breach of the Partnership Agreement that excuses Plaintiffs' further performance of their obligations under the Partnership Agreement. That conduct may have presented ample motivation for Plaintiffs to withdraw from the partnership, but it did not give Plaintiffs a license to disregard the obligations that arose as a result of a withdrawal.

79.     Finally, Plaintiffs allege that Leon and William breached the implied covenant of good faith and fair dealing. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (quoting *Harrison v. Cook*, 29 Cal. Rptr. 269, 271 (Dist. Ct. App. 1963)). However, the Court may not imply a term that already exists in the contract. *See Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, No. 12-CVS-5505, 2014 NCBC LEXIS 16, at *42 (N.C. Super. Ct. May 7, 2014); *see also Campbell v. Blount*, 24 N.C. App. 368, 371, 210 S.E.2d 513, 515 (1975) ("There cannot be an express and an implied contract for the same thing existing at the same time.").

80.     Plaintiffs first contend that Leon breached the implied covenant of good faith and fair dealing when he failed to disclose the Rives Memo to Lovell and failed

to disclose that Defendants would not treat Lovell as a full equity partner. This claim essentially recasts the fraud in the inducement claim that the Court has already rejected. The discussions between Lovell and Leon occurred before the contract was entered and cannot be implied as terms in the contract.

81. Plaintiffs separately contend that William breached the implied covenant of good faith and fair dealing when he refused to vote to expel Leon. Plaintiffs seek to use the implied covenant to vary the terms of an express provision in the Partnership Agreement. The Court rejects that effort as improper.

82. In sum, the Court concludes that while Defendants breached the Partnership Agreement by refusing to allow Lovell access to RA's books and records, that breach did not excuse Plaintiffs from performing under the agreements. On all of Plaintiffs' other breach of contract claims, Defendants are entitled to summary judgment that they did not breach the Partnership Agreement in any of the ways Plaintiff contends, and thus, there are no antecedent breaches that excuse Plaintiffs' further performance.

83. Because the Court concludes that Defendants did not materially breach the Partnership Agreement, excusing Plaintiffs' performance obligations, the Court must consider Plaintiffs' further argument that they were excused from performing based on the frustration of purpose doctrine.

### F. Plaintiffs' Performance Obligations Were Not Discharged By the Frustration of Purpose Doctrine.

84. Defendants seek a summary adjudication that both Chesson and Lovell breached sections 7.01 and 7.03 of the Partnership Agreement by failing to provide

requisite advance notice of their withdrawal and by improperly contacting RA clients during the notice period. Plaintiffs again claim that they were excused from complying with those sections of the Partnership Agreement.

85. It is undisputed that Plaintiffs did not provide the four months' written notice of withdrawal as required by the Notice Provision. (Pls.' Second Am. Compl. ¶ 133 ("[O]n October 5, 2012, [Plaintiffs] tendered their resignation from the Defendant RA effective immediately upon receipt.").) Additionally, it is undisputed that Plaintiffs contacted RA clients immediately upon leaving RA in contravention of the Client Contact Provision.

86. A party's performance under a contract may be excused "whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance." *Brenner*, 302 N.C. at 211, 274 S.E.2d at 209 (quoting 17 Am. Jur. 2d *Contracts* § 401 (1964)). The frustration of purpose doctrine, however, does not excuse performance where "the frustrating event was reasonably foreseeable" or "the parties have contracted in reference to the allocation of the risk involved in the frustrating event." *Id.*

87. Plaintiffs claim that they were required to immediately withdraw from RA because they were "jeopardizing their CPA licenses through a continued association with Defendants" due to Defendants' violations of Board Standards and acts of gross negligence. (Mem. Supp. Pls.' Mot. Partial Summ. J. 6.) Plaintiffs may have a valid argument that one or more of the RA partners violated Board Standards; however, those violations do not allow Plaintiffs to fail to comply with the Notice

Provision and Client Contact Provision of the Partnership Agreement when they withdrew from the partnership. The possibility of a partner violating Board Standards was reasonably foreseeable. In fact, the Partnership Agreement includes specific provisions that address such conduct, providing that a partner may be expelled if he commits professional misconduct or gross negligence. Additionally, the Partnership Agreement did not prevent Plaintiffs from withdrawing; it only limited their right to pursue RA clients after doing so.

88. In sum, the Court rejects Plaintiffs' contention that their performance under sections 7.01 and 7.03 was excused. Defendants are entitled to summary judgment that Plaintiffs breached those provisions of the Partnership Agreement. The Court does not here express any opinion on what damages may be awarded based upon these breaches.

## G. There Are Issues of Material Fact Regarding How to Offset the Parties' Damages for Their Respective Claims.

89. Defendants contend that, because Plaintiffs breached sections 7.01 and 7.03 of the Partnership Agreement, Plaintiffs forfeited any right to receive payments that otherwise might be due to withdrawing partners under section 7.05 of the Partnership Agreement. The Court is unable to determine as a matter of law that Defendants' obligation to pay Plaintiffs their partnership interest under section 7.05 was completely offset by Plaintiffs' breach. As noted, a party's performance obligation is discharged altogether only if the other party commits a material breach that "substantially defeats the purpose of the agreement." *Supplee*, 239 N.C. App. at 220, 768 S.E.2d at 593. The Court is unable to conclude that Plaintiffs' breach of the

Notice Provision and the Client Contact Provision substantially defeated the overall purpose of the Partnership Agreement so as to lead to a complete forfeiture of other interests that Plaintiffs may have had in the partnership at the time they withdrew. Rather, the Court concludes that the alleged damages from Plaintiffs' respective breaches may be offset against the damages, if any, resulting from Defendants' antecedent breach.

90. There are insufficient facts to allow the Court to determine that the damages, if any, that resulted from Plaintiffs' breaches, and the future Addendum Competition Provision payments to be made to Defendants, are greater than the amounts that would otherwise be due to Plaintiffs for their partnership interests.

## H. Defendants Are Entitled to Summary Judgment on Plaintiffs' Breach of Fiduciary Duty Claim.

91. A partner's fiduciary duty "imposes on [him] the obligation of the utmost good faith in [his] dealings with one another in respect to partnership affairs." *Casey v. Grantham*, 239 N.C. 121, 124, 79 S.E.2d 735, 738 (1954). "Each [partner] is the confidential agent of the other, and each has a right to know all that the others know, and each is required to make full disclosure of all material facts within his knowledge in any way relating to the partnership affairs." *Id.* Further, "a partnership agreement cannot eliminate those enumerated fiduciary duties partners owe to one another as a matter of law." *Chesson*, 2013 NCBC LEXIS 46, at *13.

92. The Court previously ruled that Plaintiffs may pursue a claim for breach of fiduciary duty "only insofar as Plaintiffs specifically allege that the Riveses breached their fiduciary duties while Plaintiffs were partners by manipulating client

accounts to divert partnership revenue to themselves personally or using partnership assets to form [Consultants]." *Id.* at \*14. Defendants have developed testimony that, other than a loan that has since been repaid, RA has never given any money or business opportunities to Consultants. (Leon Rives Aff. ¶¶ 6–9, Feb. 9, 2015.) Plaintiffs have not offered any evidence to rebut this testimony. Accordingly, the Court concludes that there are no disputed issues of material fact regarding Plaintiffs' claim for breach of fiduciary duty, that Defendants are entitled to summary judgment as a matter of law, and that Plaintiffs' breach of fiduciary duty claim should be DISMISSED.

## I. Defendants Are Not Entitled to Summary Judgment on RA's Counterclaim Against Chesson for Money Had and Received.

93. RA moves for summary judgment on its counterclaim against Chesson for money had and received. RA avers that it is entitled to be repaid its loan to Chesson for $150,000, which was used to pay obligations owed to Chesson's former employer, Dixon Hughes. Chesson argues that the payments were not a loan, but instead were used to acquire Chesson's book of business and goodwill. Additionally, Chesson contends that the Partnership Agreement's terms bar the payments from being characterized as a loan.

94. The North Carolina Supreme Court has delineated the common-law claim for money had and received as follows:

> [T]he crucial question in an action of this kind is, to which party does the money, in equity and good conscience, belong? The right of recovery does not presuppose a wrong by the person who received the money, and the presence of actual fraud is not essential to the right of recovery. The test is not whether the defendant acquired the money honestly and in

good faith, but rather, has he the right to retain it. "In short, the gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the test of natural justice and equity to refund the money."

*Smith Chapel Baptist Church v. City of Durham*, 350 N.C. 805, 818, 517 S.E.2d 874, 882–83 (1999) (citations omitted) (quoting *Ridley v. Jim Walter Corp.*, 272 N.C. 673, 677, 158 S.E.2d 869, 872 (1968)).

95. There is no written loan agreement that memorializes the terms of any loan between Chesson and RA. During the three and a half years that Chesson was an RA partner, RA never deducted any amount from payments made to Chesson as a result of any loan and never demanded repayment for any loan. Leon testified that RA was interested in bringing Chesson and his book of business to RA, that RA hired an attorney on Chesson's behalf to represent him in the Dixon Hughes litigation, and that the ultimate settlement discharged both Chesson and his partners at RA from any liability resulting from the Dixon Hughes litigation. (RA 30(b)(6) Dep. 166:18–170:12, June 4, 2014.) However, Defendants allege that the fact that Chesson considered the payment to Dixon Hughes a loan is evident from the fact that Chesson did not report the payment as income on his tax returns. (Chesson Dep. 72:15–75:9, June 5, 2014.)

96. The Court concludes that the record and the disputed contentions of the parties create an issue of material fact that must be resolved by a jury, and therefore neither party is entitled to summary judgment on RA's claim against Chesson for money had and received.

97.     As to Chesson's further contention that the Partnership Agreement bars this transaction from being characterized as a loan, the Court considers the language of section 1.06 of the Partnership Agreement. Section 1.06 states that "[a]ll previous agreements, understandings and undertakings, whether oral or written, among any partners with respect to their association for the practice of Accounting are hereby superseded in their entirety by this Agreement." (Partnership Agreement § 1.06.) The Court concludes that this section cannot be construed to bar a claim for monies advanced in order to resolve claims arising from Chesson's having left his prior firm to join RA. Accordingly, the Court concludes that if a jury finds that the $150,000 advance should be treated as a loan, Defendants will then be entitled to repayment of the $150,000, subject to an offset based on monies that RA owes to Chesson for other obligations.

### J. There Are Issues of Material Fact Regarding Defendants' Abuse of Process Claim.

98.     Plaintiffs move for summary judgment in their favor on Defendants' abuse of process counterclaim. Defendants allege that Plaintiffs included certain allegations in their complaint to embarrass or professionally damage Defendants and then distributed the filed complaint to RA clients with the intent to harm RA. (Countercls. ¶¶ 23–26.)

99.     The North Carolina Supreme Court has described a claim for abuse of process as "the misuse of [a] legal process for an ulterior purpose." *Stanback v. Stanback*, 297 N.C. 181, 200, 254 S.E.2d 611, 624 (1979) (quoting *Fowle v. Fowle*, 263 N.C. 724, 728, 140 S.E.2d 398, 401 (1965)). To prevail on an abuse of process claim,

Defendants must establish that Plaintiffs (1) had an ulterior motive and (2) committed "an act in the use of the process not proper in the regular prosecution of the proceeding." *Edwards v. Jenkins*, 247 N.C. 565, 568, 101 S.E.2d 410, 412 (1958) (quoting *Barnette v. Woody*, 242 N.C. 424, 431, 88 S.E.2d 223, 227–28 (1955)). The ulterior motive element is satisfied when it is proven that the "action was . . . used . . . to achieve a purpose not within the intended scope of the process used." *Hewes v. Wolfe*, 74 N.C. App. 610, 614, 330 S.E.2d 16, 19 (1985). The requisite action is demonstrated by establishing "that during the course of the . . . proceeding, the [party] committed some willful act whereby he sought to use the proceeding as a vehicle to gain advantage of the plaintiff in respect to some collateral matter." *Id.* Evidence of actual damages is not required. *See Stanback*, 297 N.C. at 200, 254 S.E.2d at 624.

100. The record creates issues of material fact as to whether Defendants can prove each of the essential elements of their claim. The Court earlier acknowledged "that the Amended Complaint contained allegations of professional malpractice against former clients and other improper conduct by Defendants against others that arguably had little, if any, relevance to recovering Plaintiffs' partnership interests after their withdrawal or redressing any other legal wrong committed by Defendants that harmed Plaintiffs." Order on Motion to Dismiss, *Chesson v. Rives*, No. 12-CVS-3382, slip op. at 2 (N.C. Super. Ct. July 2, 2014). Additionally, Defendants have provided evidence that when Plaintiffs and Defendants met shortly before Plaintiffs withdrew from RA, Plaintiffs' attorney threatened to ruin Defendants' reputation and

destroy their practice unless Defendants discharged Plaintiffs' performance obligations under the Partnership Agreement. (William Rives Dep. 135:19–138:23, June 5, 2014.) There is a dispute as to whether RA clients who received the complaint specifically requested it, or if clients relied on the allegations contained in the complaint when deciding to leave RA. (Defs.' Br. Opp'n to Pls.' Mot. Summ. J. 10.) Under these facts, Plaintiffs are not entitled to rely solely on the invocation of litigation privilege to defeat the claim.

101. Accordingly, the Court denies Plaintiffs' Motion on Defendants' counterclaim for abuse of process.

## K. The Final Determination of Claims for Accounting Must Await Resolution of Other Disputed Claims.

102. North Carolina General Statutes section 59-52 provides partners the remedy of an accounting to redress claims arising under a partnership agreement. *See* N.C. Gen. Stat. § 59-52 (2015). Because there are unresolved claims, upon which a final accounting would be based, neither party is entitled to summary judgment regarding a final accounting at this time.

## V. CONCLUSION

103. Based on the foregoing, the Court holds and orders as follows:

## A. Plaintiffs' Motion

1) Summary judgment is DENIED on Lovell's fraud in the inducement claim against Leon.

2) Summary judgment is DENIED on Plaintiffs' declaratory judgment claim.

3) Summary judgment is DENIED on Defendants' breach of contract counterclaims against Plaintiffs.

4) Summary judgment is DENIED on Defendants' abuse of process counterclaim against Plaintiffs.

B. Defendants' Motion

1) Summary judgment is GRANTED on Lovell's fraud in the inducement claim against Leon, and this claim is DISMISSED WITH PREJUDICE.

2) Summary judgment is GRANTED on Lovell's common law fraud claim against Leon, and this claim is DISMISSED WITH PREJUDICE.

3) Summary judgment is GRANTED on Lovell's declaratory judgment claim, and this claim is DISMISSED WITH PREJUDICE.

4) Summary judgment is DENIED as to Lovell's breach of contract claim regarding his access to RA's books and records.

5) Summary judgment is GRANTED as to all other breach of contract claims against Defendants, and these claims are DISMISSED WITH PREJUDICE.

6) Summary judgment is GRANTED on Plaintiffs' breach of the implied covenant of good faith and fair dealing claim against all Defendants, and this claim is DISMISSED WITH PREJUDICE.

7) Summary judgment is GRANTED on Defendants' breach of contract counterclaim against all Plaintiffs, provided, however, that Plaintiffs'

breach did not discharge Defendants' obligation to pay Plaintiffs under section 7.05, subject to a proper offset that must be determined.

8) Summary judgment is GRANTED on Plaintiffs' breach of fiduciary duty claim against all Defendants, and this claim is DISMISSED WITH PREJUDICE.

9) Summary judgment is DENIED on RA's money had and received counterclaim against Chesson.

10) Summary judgment is DENIED on all of the claims for a final accounting.


IT IS SO ORDERED, this the 30th day of November, 2016.


/s/ James L. Gale
James L. Gale
Chief Business Court Judge